ZEB. V. MOSELEY, ADMINISTRATOR OF THE ESTATE OF LESLIE DAVIS, v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 30 October, 1929.)

1. **Railroads D b—In this case held: evidence of defendant's negligence causing injury at crossing sufficient to be submitted to the jury.**

   In an action to recover damages for the negligent killing of the plaintiff's intestate, evidence tending to show that the defendant's rapidly moving train collided with an automobile the plaintiff was driving at a much used public crossing, coming upon him without signal or warning at a place where the defendant's tool and supply houses obstructed the intestate's view so that he could not apprehend the danger in time to avoid it, is sufficient to take the case to the jury upon the question of whether the defendant's negligence was the proximate cause of the injury in suit.

2. **Same—Testimony of witnesses that they did not hear approaching train give warning is sufficient to be submitted to the jury.**

   Where the plaintiff's intestate has been killed in a collision of his automobile with the train of the defendant at a public crossing, and the question is involved as to whether the defendant negligently omitted to give warning of its approaching train, testimony of witnesses who were present that they did not hear the bell ring or the whistle blow is sufficient to take the case to the jury on this question.

MOSELEY *v.* R. R.

**3. Same—In this case held: question of plaintiff's negligence in failing to stop before crossing was for the jury.**

Where there is evidence that the defendant's train colliding with an auto truck of the plaintiff's intestate as he was attempting to cross the defendant's tracks at a public crossing, with the train speedily coming upon him without warning, the question is for the jury as to the negligence of the intestate in failing to stop before attempting to cross under the rule of the prudent man under the facts of this case.

**4. Same—Question of whether crossing was extraordinarily dangerous requiring watchman or gongs was for the jury in this case.**

While it is negligence *per se* for a railroad company not to observe a statutory requirement of maintaining gates or safety devices, or watchmen at a grade crossing, it is also incumbent upon it, in the absence of statute, to do so when the crossing is much used by the public and is more than ordinarily dangerous, and the failure to do so would be a great menace to the public, and the question of whether or not such precautions were required is for the jury under correct instructions under the evidence in this case.

APPEAL by defendant from *Nunn, J.,* and a jury, at February Term, 1929, of LENOIR. No error.

This is an action for actionable negligence brought by plaintiff, administrator of Leslie Davis, against the defendant for killing his intestate at a street crossing. The defendant denied negligence and pleaded contributory negligence.

Leslie Davis, a young white man about 30 years old, drove a truck selling bottled soft drinks in crates, for one W. F. Tyndall, who lived in Kinston, who was in the bottling business. Davis drove a Chevrolet truck weighing about 2,500 to 3,000 pounds, which usually carried a load of 3,000 to 4,000 pounds. The truck had a cab the width of about 3½ to 4 feet. The distance from the front of the truck to the back of the driver's seat was 7½ feet. The front of the truck was 6½ feet from the driver. On the morning of 6 April, 1927, he left the city of Kinston with a negro boy, Joe Smith. Davis was driving the truck; they went to Goldsboro, Pine Level, Selma and then to Smithfield. They drove across the railroad tracks on Johnson Street and stopped at Jim Obey's store on the east side of Johnson Street and on the east side of defendant's railroad. The store was on the south side of the street. Joe Smith usually handled the crates. After making a delivery at Obey's store, they got in the cab, Davis at the wheel and Smith beside him. The cab was the usual one of such trucks, closed with doors on both sides, six windows counting the front one—nothing to obstruct the view of one riding in the cab.

The railroad ran north and south, and Johnson Street east and west. There were four tracks of the defendant railroad that crossed Johnson

Street and a spur track branching out from the first east track leading to the ice plant on the north side of Johnson Street. The tracks of defendant are within the corporate limits of Smithfield. From the east side of the northbound main line track, the second east track which passenger train No. 80 was on, which killed Davis, to the side of Obey's store is 67 feet. There was a roadway, alley or lane about 20 feet wide to the west of Obey's store going south and back of and to the east of two railroad houses which faced the railroad, the two houses fronting on track one. A tool house 14.4 feet by 16.4 feet and 11.2 feet high, a few feet from Johnson Street, and a supply house a few feet south of the tool-house, which is 30.4 feet by 12¾ feet and 15.7 feet high. Before reaching Johnson Street, south of these two houses, the tracks of defendant company curve practically all the way down about a quarter of a mile south of Johnson Street. The tool-house is 10 feet from the eastern rail of the first track. From the tool-house to the northbound main line track, the eastern edge of same is about 26 or 27 feet. From the supply house to the east rail of the northbound main line track is about 24 or 25 feet. From the center of the sidetrack to the center of the main line track is 15 feet. The distance from the east rail of the northbound track to the east. rail of the pass track that you reach before getting to the northbound track is 15 feet. Between the rails it is about 4.9 feet. A person driving from east to west on Johnson Street when he reached a point on Johnson Street 25 feet from the east rail of the main line, the track the train was 'on which killed Davis, looking south his view would hit the tool and supply houses. After he cleared the houses at a point 23 feet from the east rail of the main line, his view would hit the curve some 147 yards down the track—12 feet from the east edge of the rail of the northbound track he could see down the track 800 feet. Driving in a car the front end "would be on the side track (first track) adjoining the main line (second track) before he could see any distance towards the south down that main line track" in the direction the train No. 80 was coming, which killed Davis. "After clearing those buildings going towards the main line, I would say you could see 250 feet" (about 84 yards).

Numerous witnesses testified that they heard no whistle of the train or bell rung for Johnson Street crossing; no signal until the emergency whistle blew three short blows right close together about 50 feet of the crossing where Davis was killed. When the engineer applied the brakes from the looks of the rail there were blue places—two on each rail opposite each other, like something had rubbed it and turned it blue. "I know what they were; they looked like friction marks from the application of brakes." They were 30½ feet from the center of the plank crossing. No. 80 was a little late, running 35 to 40 miles an hour.

There was continuous traffic across Johnson Street used by automobiles, trucks, bicycles and all kinds of conveyances and as a walkway. At the time there was a negro school in session; about 500 children attend the school and about 75 per cent have to cross Johnson Street to go to school; near the crossing there are two stores on the south side and an ice-house on the north side. "There are probably 75 houses, stores, churches and schoolhouses on the east side of the railroad where Johnson Street runs; that is the way they get across there unless they go through and strike the old No. 10 about a quarter of a mile. Johnson Street is our only way in and out; it is used largely." At the crossing "there are no gates kept there by the railroad company, no bells, gongs or devices of any kind to warn of the approach of trains, and no watchman there." Near the ice plant, across the street from Obey's store, is a "N. C. Law Stop" sign facing the east approach of the crossing.

When Davis and the negro boy got in the cab of the truck the truck was facing east and within the zone between the railroad and the stop sign. The Chevrolet truck was in good condition, practically new; perfect mechanical condition. The motor was in fine condition. Davis was a good driver.

From the center of the intersection of Johnson Street to the main line of the defendant company's railroad to the center of the depot, which is north, is 223 feet. From the center of Johnson Street crossing to where the truck was found after the wreck and carried by the train, was 300 feet. The body of Davis was carried by the train 140 feet from the intersection of Johnson Street. The body of Davis was found between the two east tracks. The train that killed Davis was on track two, and the truck was thrown off on the same side as the body—both thrown on the east side of the main line track two that the train was on. Johnson Street crossing over the tracks was built of dirt and rock and timber, 10-inch plank, on both sides of the rails on the second track to make the approach even with the rails. The approach was on a slight incline. "On the pass tracks the rails are level with the street. The rails of the main line tracks are larger than the rails on the pass tracks—stand up higher on the track and are heavier." The train consisted of "four express cars, a mail storage, mail postage, baggage car, colored coach, white coach, and New York Pullman, and in addition to that the engine and tender." The average car is about 60 feet and the engine about 100 feet, total length of train 700 feet.

The train approaching Johnson Street, the rear end of the last coach was 5.8 feet lower than the front of the engine.

"The truck backed back from in front of Obey's store on the side just off to one side of the street, and that made it face the railroad, and it curved out and started on across the railroad track. Approaching the

railroad track from the east going along Johnson Street towards Smith-field you do not have any view down the track to begin with on account of the obstruction of these two houses until you get beyond those houses going toward the railroad. You would have to get down beyond, in other words, by these two houses on the right-of-way; that would put you about to the first sidetrack." "Johnson Street in front of Obey's store is about 20 to 25 feet." "As to the construction of the crossing, the only thing I know is there is a board on each side of the T-iron, and then there is dirt, and it is a narrow crossing about 10 feet wide." It was in evidence that trains were frequently crossing Johnson Street day and night.

Joe Davis, the negro boy, described what happened thus: "After we delivered the drinks to Obey's store this day we got in the truck and backed right short around Obey's store corner; there is a little lane down there; we backed the truck from in front of this first store, then we started on across the railroad. At that time I was in the truck—in the cab with Mr. Davis. I was looking to the right and he was looking to the left; the right is towards the depot. I did not hear any train blow until it was right on us. The first knowledge I had that there was a train coming, I looked toward the station to the right, and the people were all looking that way; looked like they were mad or something, and I looked down to the south and saw the train coming. At that time it was a little over 100 yards from us, and at that time the truck was between the first and second tracks, and the front wheel was on the track on which the train was coming. When the train got there right on us, it got almost on the running board when it blowed; he blowed the death blow, and I jumped out between the tracks. When I first saw the train it was a little further from us than from here to the rear of this court-room; I could not tell how fast it was traveling. When I saw the train I said, 'Lordy, Mr. Davis, there comes the train,' and he said 'Lord God,' and I jumped out. I had my foot on the running board when the train blew the three whistles; then when the train hit the truck I had just passed the back end of the truck running. . . . The truck was traveling about 10 miles an hour. We had not changed gears. He generally crossed clear across the track in low gear; he had not gotten out of low gear at the time the accident happened. When I jumped out the truck was running 10 miles an hour; when I jumped out I was facing towards the east; I jumped out backwards. I had to catch myself and start back the other way and run."

The issues submitted to the jury and their answers thereto, were as follows:

"1. Was the death of the intestate, Leslie Davis, caused by the negligence of the Atlantic Coast Line Railroad Company, as alleged in the complaint? Answer: Yes.

2. Did the said Leslie Davis, by his own negligence, contribute to his death, as alleged in the answer? Answer: No.

3. What amount of damages, if any, is the plaintiff entitled to recover for the death of the said Leslie Davis? Answer: $15,000."

The defendant made numerous exceptions and assignments of error, and appealed to the Supreme Court. The material ones will be considered in the opinion.

*Manning & Manning and F. E. Wallace for plaintiff.*
*Rouse & Rouse for defendant.*

CLARKSON, J. The first main assignment of error by the defendant was to the refusal of the court below at the close of plaintiff's evidence, and at the close of all the evidence, to dismiss the action or for judgment as in case of nonsuit. C. S., 567. This assignment of error cannot be sustained.

As often repeated: "It is the settled rule of practice and the accepted position in this jurisdiction that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim, and which tends to support her cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and she is 'entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.'" *Goss v. Williams,* 196 N. C., at p. 216.

The evidence was conflicting in many respects, but we must consider it in the light most favorable to the plaintiff, taking into consideration all the evidence. In the town of Smithfield plaintiff's intestate and his negro helper crossed the railroad tracks on Johnson Street going east in a truck. After delivering from the truck bottled drinks at the first store on the south side of Johnson Street, they started to recross. They both entered the cab, plaintiff's intestate at the wheel, the negro boy by his side. The cab was then facing east. The driver backed the truck into a lane or alley between the store and the first railroad track to turn so as to cross the railroad. The driver's seat was 6½ feet from the front of the truck. He had to cross the first track and the main northbound track (second) going west. The crossing on Johnson Street over the second track was only 10 feet wide—that was the width of Johnson Street at that point—at least that was the length of the timber placed on each side of the T-rails so that vehicles could climb over. He had to adjust the heavy truck to the narrow passage provided over the T-rails. The train was approaching this crossing on the main northbound track (second) running 35 to 40 miles an hour, without any signals being heard, either whistle or bell for the crossing. The crossing was in a

thickly settled portion of a town, much traveled, with no device of any kind or watchman to give warning of the approach of trains. The train was coming north around a curve, the vision of plaintiff's intestate was obstructed by a tool and supply house of defendant company. Plaintiff's intestate was looking to the left in the direction that the train was coming. It was impossible for him to see the oncoming train on account of the obstructions. He was a good driver, the machine in perfect mechanical condition, running 10 miles an hour in low gear. As he proceeded and passed where he could get a vision of the oncoming train from where he was sitting, it was only 23 feet from the main track on which the train was coming, and from the cab where he was sitting to the front of the machine was 6½ feet. He had only 16½ feet for the machine to travel before reaching track two, which the oncoming train was on, and could only see, by the testimony of one witness, about 84 yards, and another 147 yards, down the track. Thus, from the evidence, he got in this perilous danger zone. The machine did not get over the second track; the rails between the tracks were 4.9 feet. Plaintiff's intestate's body was carried about 140 feet and the truck carried about 300 feet, and both thrown off on the east side of the main track. As a matter of law, we think there was sufficient evidence to be submitted to the jury on the question of negligence and contributory negligence, and the court below correct in refusing to nonsuit plaintiff.

In *Russell v. R. R.*, 118 N. C., at p. 1108, it is said: "It is the duty of an engineer in charge of a moving train to give some signal of its approach to the crossing of a public highway over a railway track or to a crossing which the public have been habitually permitted to use; and where he fails to do so, the railway company is deemed negligent and answerable for any injury due to such omission of duty." *Perry v. R. R.*, 180 N. C., 290; *Rigsbee v. R. R.*, 190 N. C., 231; *Earwood v. R. R.*, 192 N. C., 27; *Franklin v. R. R.*, 192 N. C., 717; *Finch v. R. R.*, 195 N. C., 190.

In *Franklin v. R. R., supra*, at p. 719, it is said: "The plaintiff testified that he heard no signal prior to or at the time he stepped upon the crossing. This is some evidence that no signal was given. . . . The law makes it the duty of the person using a crossing of a railroad track to make diligent use of his senses in order to discover whether there is danger of injury or collision."

"Failure to stop before crossing a railroad track cannot be declared to be contributory negligence as matter of law, but that it should be considered by the jury in connection with the surrounding circumstances in determining whether the party was exercising the care of one of ordinary prudence." *Perry v. R. R., supra*, at p. 297.

In *Shepard v. R. R.,* 166 N. C., at p. 545, it is said: "It is also estab-lished by the weight of authority that it is not always imperative on a traveler to come to a complete stop before entering on a railroad cross-ing; but 'whether he must stop, in addition to looking and listening, depends upon the facts and circumstances to each particular case, and so is usually a question for the jury.' *Barber v. R. R.,* 193 N. C., at p. 694-5."

The law is thus stated in *Williams v. R. R.,* 187 N. C., at p. 353: "*Goff v. R. R.,* 179 N. C., 216, as already stated, cites the rule laid down in *Edwards v. R. R.* (129 N. C., 79), that the failure to hear signals is sufficient to carry the case to the jury, and it was further held: 'If his (plaintiff's) view is obstructed, or his hearing the approaching train is prevented, and especially if this is done by the fault of the de-fendant, and the company's servants fail to warn him of its approach, and, induced by this failure of duty, which has lulled him into security, he attempts to cross the track and is injured, having used his faculties as best he could, under the circumstances, to ascertain if it was danger-ous ahead, negligence will not be imputed to him, but to the company, failure to warn him being regarded as the proximate cause of any injury received,' citing *Mesic v. R. R.,* 120 N. C., 490; *Osborne v. R. R.,* 160 N. C., 309."

"It is conceded by all the authorities that the standard by which to de-termine whether a person has been guilty of negligence is the conduct of the prudent or careful or diligent man." Bigelow, Torts, 261.

"Contributory negligence is the negligent act of a plaintiff which, concurring and coöperating with the negligent act of the defendant, is the proximate cause of the injury. The same rule of due care which the defendant is bound to observe applies equally to the plaintiff. There is really no distinction between negligence of the plaintiff and negligence of the defendant, except the plaintiff's negligence is called contributory negligence. The law further says, . . . that contributory negligence may consist of some act of omission or act of commission. It is the lack of due diligence or the lack of due care in doing the wrong thing at the time and place, or in doing nothing when something should have been done. That is to say, did the plaintiff fail to exercise due care which an ordinarily prudent man would have exercised under similar circum-stances, and was said failure so to do the proximate cause of his injury?" *Inge v. R. R.,* 192 N. C., at p. 531. The above charge on contributory negligence held correct. *Certiorari* denied. 273 U. S., 753. It goes without saying, as it is so well settled, that the proximate cause of an injury is for the jury. A serious and troublesome question is contin-ually arising as to how far a court will declare certain conduct of a de-fendant negligence and certain conduct of a plaintiff contributory negli-

gence and take away the question of negligence and contributory negligence from the jury. The right of trial by jury should be carefully preserved, and if there is any evidence, more than a scintilla, it is a matter for the jury and not the court.

"Plaintiff, while attempting to cross the tracks of defendant in the city of Sioux Falls collided with a train of defendant and the automobile in which he was riding damaged. Plaintiff claims the accident was caused by the negligence of defendant's employees by reason of their failure to blow the whistle or ring the bell of the engine when approaching the crossing. Defendant pleads contributory negligence on the part of plaintiff in not keeping a proper lookout for the train as he approached the crossing and in not using due care under all the circumstances: *Held,* that when it is considered that the space between the first view and the rail was only twenty-five feet, and the space within which a safe stop could be made was much less owing to the projection of the automobile ahead of the driver's seat and of the cars of the train over the rail, and after allowing time to look both ways, operate the brakes and come to a standstill the court cannot say respondent was negligent in failing to stop far enough from the track to escape injury. It is one's duty to use due care, but what acts constitute due care under all the circumstances cannot be prescribed in advance, and when not so prescribed, whether or not due care was exercised becomes a question of fact for a jury and not one of law for the court." *Morrisey v. Chicago, Milwaukee & St. Paul Ry. Co.,* So. Dakota, 226 Northwestern Reporter, p. 731.

In the case of *Harrison v. R. R.,* 194 N. C., 656, the plaintiff's witness testified, "there is nothing in the world to keep a man from seeing the train approaching from the south if he would look before he got on the track." Harrison's intestate, Lomax, had stopped his machine waiting for the freight train going southwardly to pass over the crossing. "If Mr. Lomax had looked from where he was sitting in his automobile, I would say, in my judgment, he could have seen the train, which struck him, approaching for a distance of 75 or 100 yards."

In the case at bar, plaintiff's intestate was looking to the left—the direction the train was approaching. His view had theretofore been obstructed by defendant's houses. His machine was running; whether he could have stopped in time was a question of due care for the jury. We think the *Harrison* case is distinguishable from the present action.

The second main assignment of error by defendant was to the effect that the court below improperly instructed the jury in regard to the duty of defendant in reference to safety device or watchman at the crossing where plaintiff's intestate was killed. This assignment of error cannot be sustained.

There was continuous traffic across Johnson Street used by automobiles, trucks bicycles, and all kinds of conveyances and as a walkway. At the time there was a negro school in session; about 500 children attend the school and about 75 per cent have to cross Johnson Street to go to the school; near the crossing there are two stores on the south side and an ice-house on the north side. "There are probably 75 houses, stores, churches and schoolhouses on the east side of the railroad where Johnson Street runs; that is the way they get across there unless they go through and strike the old No. 10 about a quarter of a mile. Johnson Street is our only way in and out; it is used largely." At the crossing "there are no gates kept there by the railroad company, no bells, gongs or devices of any kind to warn the approach of trains and no watchman there."

On the evidence the court below charged the jury as follows: "A railroad company is not legally bound to provide and maintain gates at street and highway crossings along its line, unless so required by statute or ordinance, or unless it appears that the particular crossing is peculiarly dangerous. In the absence of a statutory requirement it is not negligence *per se* (in itself) for a railroad company to fail to maintain a flagman or watchman at a grade crossing of its track and a public road to warn travelers on such road of approaching trains. The mere absence of a statute requiring a flagman or watchman at crossings will not, however, of itself relieve the railroad company from the duty to maintain one, and where a crossing is so peculiarly dangerous that the reasonable safety of the traveling public requires the presence of a flagman or other extraordinary means to signal the approach of the trains, it is incumbent upon the railroad company to employ such means. It is for the jury to say whether under all the circumstances of a particular case the railroad has been guilty of negligence in not maintaining a flagman or watchman at a particular crossing. Before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or watchman at a crossing, it must first be shown that such crossing is more than ordinarily hazardous, as for instance, that it is in a thickly populated portion of a town or city, or that the view of the track is obstructed either by the company itself or by other objects proper in themselves. The frequency with which trains are passing, and the amount of travel, or noise, are also material circumstances in considering the question of danger."

It will be noted that the court below charged in the present action on the evidence: "It must first be shown that such crossing is more than ordinarily hazardous, as for instance, that it is in a thickly populated portion of a town or city, or that the view of the track is obstructed either by the company itself or by other objects proper in themselves.

The frequency with which trains are passing, and the amount of travel, or noise, are also material circumstances in considering the question of danger."

In *Batchelor v. R. R.,* 196 N. C., at p. 87, speaking to the subject, it is said: "Applying these principles of law to the facts disclosed by the record, there is no evidence of obstruction existing at this crossing; neither is there evidence that the vision of a traveler was obscured by curves, embankments, buildings or other conditions, which rendered the crossing more than ordinarily hazardous, nor does the record disclose any condition of peculiar danger. Therefore, we hold that the failure of the defendant to maintain gates or gongs at this crossing was no evidence of negligence."

In the present action the evidence was plenary to be submitted to the jury that the vision of the traveler was obstructed which rendered the crossing more than ordinarily hazardous and peculiarly dangerous. It must be borne in mind that this was not a country crossing, or in a thinly settled community, but a street of a town thickly populated, much traveled, a busy thoroughfare. Defendant's train frequently passed it day and night. *R. R. v. Ives,* 144 U. S., 408; *Dudley v. R. R.,* 180 N. C., 34; *Blum v. R. R.,* 187 N. C., 640; *Finch v. R. R., supra.*

It will be noted that in all the cases in this jurisdiction where the question was left to the jury, the evidence was similar to that in the present action. The evidence was different in the *Batchelor case, supra,* the evidence was that "plaintiff's intestate was traveling on a much traveled road as a county road, but not as a highway." The *Batchelor case, supra,* is annotated in 60 A. L. R., 1091. The annotations give numerous citations from many States and cites the *Batchelor case* under the following, at p. 1096(a): "It may be stated generally that, unless required by statute or order, a railroad company is under no duty to provide gates, gongs, or other safety devices at public crossings, and that, therefore, the failure to do so at any particular crossing is not negligence *per se.*" The *Dudley* and *Blum cases, supra,* are annotated at p. 1196(b): "Where the evidence shows that a railroad crossing is for any reason peculiarly dangerous, it is a question for the jury whether the degree of care which a railroad company is required to exercise to avoid accidents at crossings imposes on the company the duty to provide safety devices at that crossing." The *Batchelor case, supra,* sustains this position.

The following is set forth in Roses' Notes on United States Reports, Revised Ed., Supplement, Vol. 3, at p. 197: "Whether ordinary care requires flagman at crossing is for jury. Followed in *Panama Railroad Company v. Pigot,* 254 U. S., 553, 65 L. Ed., 43, 41 Sup. Ct., 200, in action for death of minor of seven years, question of whether proper

care required railroad to have flagman or gate at crossing was for jury. *Lofland's Brickyard Crossing Cases,* 5 Boyce (Del.), 157, 91 Atl., 288, in action for injuries in crossing accident, failure of railroad to station flagman at crossing is evidence to be submitted to jury; *Glanville v. Chicago R. I. & P. R. Co.,* 190 Iowa, 180, 180 N. W., 155, in action for injuries received in collision of automobile with train, failure to maintain flagman or signaling device is not basis for charge of negligence, *in absence of showing crossing is unusually dangerous; Wichita Falls & N. W. Co. v. Grovers,* 81 Okla., 53, 196 Pac., 678, in action for death from backing of train at railroad crossing, whether railroad was negligent in not maintaining flagman or automatic signals, though no statute or ordinance required them, was for jury." (Italics ours.)

We think the court laid down the rule in the charge approved in this jurisdiction in this particular action. The generalities in the charge on the subject is not so antagonistic or conflicting as would be held prejudicial or reversible error, as was held in *May v. Grove,* 195 N. C., 235.

The third main assignment of error by defendant was in regard to the charge on sudden peril and emergencies. We do not think this can be sustained. *Parker v. R. R.,* 181 N. C., at p. 103; *Odom v. R. R.,* 193 N. C., 442. The other assignments of error as to admissibility of testimony and other exceptions to the charge, we do not think, if error, are reversible or prejudicial. On the whole record it appears that the court below tried the action with care and the charge covered every phase of the law bearing on the evidence. We can find in law

No error.