This is an action for actionable negligence instituted by plaintiff against the defendants, alleging damage. The defendants deny negligence and set up the plea of contributory negligence.
The Sinclair Refining Company, further answering, says: "That in the event the jury should find that the plaintiff's injuries were in any wise caused by the negligence of the defendants, which this answering defendant denies, then this answering defendant alleges and says: That the negligence of its codefendant, the Norfolk Southern Railroad Company, was the proximate cause of the plaintiff's said injuries. And if any judgment be had against this answering defendant on account thereof, then this answering defendant is entitled to have judgment over against its codefendant, the Norfolk Southern Railroad Company, for such amount." *Page 785 
The evidence was to the effect that the defendant, Norfolk Southern Railroad Company crosses the State Highway No. 11 on the outskirts of the corporate limits of the town of Greenville, and in a thickly settled mill village. The defendant Sinclair Refining Company owns and operates, or leases and operates, oil and gasoline tanks, a distributing station and buildings in the northeast corner or intersection of said railroad and Highway No. 11, and has been owning and operating the said station for two or three years. "There is a switch or spur track of the Norfolk Southern Railroad running out in the Sinclair Refining Company's yard. . . . The said station or building is about sixty feet from the railroad. The switch or spur track which runs out in the Sinclair yard at its nearest point to State Highway No. 11 is thirty-eight feet. . . . In approaching the crossing from the west there is a filling station in about one hundred feet of the crossing, on the north side of the highway. There are some stores next to said filling station and another filling station. It is a well traveled road. . . . The Norfolk Southern Railroad did not have gates there at that time to stop the traffic when trains were passing; they did not have or keep a guard there with a flag, to guard the traffic and travel. They did not have any gongs there to ring at that time."
The plaintiff testified, in part, that he was driving a Ford, model T, on 11 March, 1928, with his nephews in a car behind him, along Highway No. 11. "Just before I got to the Norfolk Southern crossing, I wanted to see if the boys were behind me, as I was showing them the proper way out of the highway. They were never here before. I stopped my car to see if they were behind me. They were. And I could not see to my right, for the first obstruction was this station. I drove by that, and the next obstruction was this lumber and signs and the oil tanks. I didn't see any train or could see no signs of any train. I could see to my left down to the factory; I could see everything clear, but when I put my car in gear and when I was on the track I could see the train flying. I couldn't do anything. I was practically right under it before I knew there was a train around. I looked westward, or tried to look westward down the railroad. When I drove to the crossing I couldn't see, and I had occasion to stop to see if those boys were behind me as they didn't know exactly the highway. I looked westward; I could not see down the railroad until I was in five feet of it, five or six feet before I could see to my right at all down the railroad, but when I started my car and got on the track the first thing I seen about the railroad engine was the drive-wheel flying very fast. It was on me; I realized that, and before I knew it I was on the track under the engine. The whistle did not blow for the crossing, the bell of the engine did not ring for the crossing. I did not hear the train at all; didn't know there was a train *Page 786 
about me until about two seconds before it hit me. . . . The tank cars were over to my right when I was coming to this railroad crossing. They were to my right on this spur that runs into this filling station. There were two tank cars. They were setting on this spur that leads in from the main line to this filling station. . . . I can't say how far they were pushed out from the main line of the railroad. I had to get within five or six feet of this railroad crossing before I could see down the main line. . . . The pile of lumber was between the spur and the end of the shed. The pile of lumber was between the spur and the main line. . . . When I stopped and looked down the track looking for trains I was on my right-hand side going out. I stopped on my right-hand side going out. . . . Then the train struck me. I cannot say how far I went, but I was knocked over toward the little room that sits off here. It isn't a tool house; it may be a paint house. It was on the opposite side of the railroad. . . . I and the car fell. I think I was knocked between thirty and forty feet. . . . I was hurt about ten o'clock in the morning. At that time and prior to the time that I was hurt it was the heaviest traffic highway that come into Greenville by a whole lot. That crossing is in a country village. It is a cotton-mill settlement, and stores. . . . On the right-hand side going out, when you come to a filling station you will find stores and some people living along there on the right. . . . My right pelvis, I believe they call it, some have different names for it, but it is down in here, was spread or busted open. My pelvic bone was broken in two. This leg was broken in two (indicating left leg), and this knee cap was broken. It was my right knee cap that was broken. It was my left leg that was broken. This right knee cap was dislocated, turned around off the top and tore up — the ligaments all tore up; my cheek bone was busted in and the roof of my mouth was so split up so that my teeth came down below, and when I pushed them up it pushed my cheek bone in two. I had to hold it that way; this hand was broken; several cuts about the face and scalp. (Cross-examination, in part): I stopped from the crossing about as far as from here to that window (estimated at about 40 or 45 feet). . . . I said that when I drove to about fifty feet of the track the boys were trailing me, and I looked back to see if they were following me, and then I was fifty feet from the track. I absolutely came to a stop. I came to a standstill and looked back to see if the boys were behind me. . . . They stopped when I stopped. I am positive they were close behind me; they were at a position to stop and they had to stop or they would have run over me. From that conclusion I say they stopped. I say I stopped, and I say they stopped, and when I saw that they were back of me I started on. I did not see the train until I got on the track in five feet. I was trying to see down *Page 787 
the track towards Farmville; kept watching all the time, but I was practically on the track when I saw the engine. I said I couldn't see down the track until I got on it, in five feet of it. I couldn't see down the track until I got within five feet of the track. . . . I can't say how close the western end of the car was to the northern iron of the main line; that spur runs so close I can't tell you. I can only tell how it blocked the view of the approaching train. That's the only thing I can tell you. I am positive there were two of those cars. . . . I did not hear the whistle. I did not hear the bell ring. I did not see any smoke and did not see any signs of the train at all until I was practically under it. . . . I said that I could not see the train on account of these two cars and the pile of lumber, and there was a sign right there in the view, and you see when I was driving up all of it obstructed the view. When you would pass one you would meet another one. I guess the pile of lumber was as high as your head. I guess I could see the train over the pile of lumber if there hadn't been anything but the lumber I possibly might have seen the train. The lumber had something to do with it; everything I passed was one obstruction right after another. I said I could have seen the train above the lumber. As to the sign I was talking about there was an angle I could have got in that would have hid the whole train. I was on the highway and the sign was in that fork. . . . I don't know whether the train was behind the sign or the tanks when I passed them. The sign was about as big as that curtain (about 6 by 12 feet). I would not swear that it was as big as that curtain, but it was high enough to hide the train. . . . I know that sign obstructed the view of the train, but I can't tell you how far it was. . . . There was so many of those things. I do know what kept me from seeing the train when I was close to the track and that was the tanks. I am positive that there were tanks on that track, without a reasonable doubt; yes, sir. I told you that I did not hear the train blow. I told you that I didn't hear the bell ring, and I am absolutely sure about it. I did not see a smoke and did not see the train coming, until I was right under it." The plaintiff was corroborated by numerous witnesses.
At the close of plaintiff's evidence, the court below sustained motions of defendants for judgment as in case of nonsuit. C. S., 567. As to the Sinclair Refining Company, we can see no error; but as to the Norfolk Southern Railroad Company we think there was error. *Page 788 
As often repeated, it is the well settled rule of practice and the accepted position in this jurisdiction that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim and which tends to support his cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.
On this appeal we do not think it necessary to pass upon the exceptions and assignments of error in regard to certain evidence introduced by plaintiff and excluded by the court below. On the present record we do not think there is sufficient evidence to be submitted to the jury as to actionable negligence on the part of Sinclair Refining Company. We think the evidence sufficient to be submitted to the jury as to the Norfolk Southern Railroad Company. We will not discuss the evidence, as the case goes back to be heard again. The principles of law governing this action have been thoroughly and fully considered in many recent decisions. Moseleyv. R. R., 197 N.C. 628; Collett v. R. R., 198 N.C. 760; Scoggins v. R.R., 199 N.C. 631; Butner v. R. R., 199 N.C. 695; Harris v. R. R.,199 N.C. 798; see Eller v. R. R., ante, 527.
The judgment of the court below as to the Sinclair Refining Company isaffirmed, and as to the Norfolk Southern Railroad Company reversed.