MRS. MABEL C. WHITE, ADMINISTRATRIX OF THE ESTATE OF F. L. WHITE, DECEASED, v. NORTH CAROLINA RAILROAD COMPANY.

(Filed 16 June, 1939.)

1. **Trial § 22b—**

Upon motion to nonsuit, the evidence tending to support plaintiff's cause of action is to be considered in the light most favorable to plaintiff, and she is entitled to every reasonable intendment upon the evidence and every reasonable inference therefrom.

2. **Railroads § 9—Evidence held sufficient to be submitted to the jury in this action to recover for death of intestate resulting from a crossing accident.**

The evidence favorable to plaintiff tended to show that intestate, while attempting to drive over a railroad crossing within an incorporated town on a dark, foggy night was struck and killed by defendant's freight train running on its main line track, that there were two sidetracks before reaching the main line track, that the view of a driver was obstructed until he was within eight or ten feet of the main line track, that the crossing was in the business section of the town and traversed by heavy traffic, that defendant maintained no safety appliances, warning signals, or flagman at the crossing, and that the train was traveling between forty and fifty miles an hour in violation of the town ordinance, and that

it gave no warning by bell or whistle. *Held:* The evidence was properly submitted to the jury on the issues of negligence and contributory negligence.

3. Same—

The violation of a municipal ordinance regulating the speed of trains within its limits is negligence *per se,* and ordinarily whether such negligence is a proximate cause of the injury in suit is for the determination of the jury.

4. Same—

An engineer is charged with the duty of giving some signal of the approach of the train to a public crossing.

5. Same—

The failure of a motorist to come to a full stop before entering upon a railroad crossing as required by statute is not contributory negligence *per se,* but such failure is a circumstance to be considered by the jury with the other evidence in the case upon the question. Michie's North Carolina Code, 2621 (47) (48).

6. **Death § 8—Charge held erroneous in failing to instruct jury that it should not consider income derived from investments.**

The evidence disclosed that intestate had a large amount of income producing investments and was also engaged in a gainful occupation. *Held:* The charge on the issue of damages should have confined the jury's consideration of the income of deceased during his life expectancy to earned income, and the failure to exclude from the jury's consideration income derived from investments is error.

APPEAL by defendant from *Hill, Special Judge,* and a jury, at November Civil Term, 1938, of ALAMANCE. New trial.

This is an action for actionable negligence, brought by plaintiff, administratrix of F. L. White, deceased, against defendant, to recover damages for the death of her intestate. C. S., 160. The defendant denied negligence and set up the plea of contributory negligence.

The evidence on the trial was to the effect that the population of the town of Mebane is about 1,500 inhabitants. Fourth Street, where plaintiff's intestate was killed, is in the business part of the town and one of its main streets. It is paved. Before you enter the main Highway No. 10, this street crosses the highway.

W. T. LeGrand, Jr., witness for plaintiff, testified, in part: "Highway No. 10 is a paved highway and is very heavily used. Cars passed at all times of the day and night, and trucks also. Fourth Street is traveled a good deal, due to the fact that it is in the business part of the town and covers each side of the residential section also. After Fourth Street crosses the railroad and then crosses Highway No. 10, it then enters the business section of the town. . . . As you cross Fourth Street going north across the railroad, the railroad station building is

on your right to the east. The driveway to the station comes right down to the street in a few feet. It is a platform where you can drive across on up to the platform of the station. That driveway comes down to within about 10 feet of Fourth Street. This station extends the length of the block there, the whole platform and building. The depot fronts on Fifth Street and runs almost through from Fifth to Fourth Street. The building next to the Fourth Street is more or less a platform with a low roof on it for unloading things. The roof is supported by posts six by six or something like that. The platform is about 5 feet high. The opening between the roof and the platform is about 12 or 15 feet. I think there are two tracks between the depot and the main line track. Both of these cross Fourth Street. Going north on Fourth Street you would cross two tracks before you got to the main line. The freight siding there that you reach going north to the platform or depot is about a foot. A freight car just goes by the platform. Then there is another one and then the main line. . . . I observed the condition around the depot and on the sidings looking east on the night that White was killed. That is, east of the Fourth Street crossing. There were several boxcars east of the Fourth Street crossing there. On the first siding next to the depot. They were something like 190 feet from the Fourth Street crossing. I measured them the next day. . . . I have those exact figures—190 feet east of the crossing. It was 193 feet to the first boxcar from the Fourth Street crossing, that is east. There was more than one boxcar standing on that siding. I just don't remember the number, but I would say there were several. They were extending east down the siding toward Fifth Street. There were no other structures immediately east from Fourth Street crossing other than the depot itself. I think there were two electric light poles and a railroad sign right to the right of the platform there, to the right of the driveway. I am talking about the runway that goes up to the platform. I think they are regular telephone or light poles, about 14 inches in circumference, something like that. It had been raining on this evening. It was a drizzly rain, and it was just a little bit foggy. This occurred about 6:30 in the evening. It was dark. On this occasion I don't recall whether or not there were any lights or anything on the depot. . . . Fifth Street is a block away from Fourth Street. . . . On Fifth Street, they have two bells, one on each side of the crossing, worked by electricity, and when the train comes within a certain distance, these bells start ringing, and a red light. It continues to ring until the train has passed over it. . . . The third track from the south, being the main line track, is the track that trains pass through the town on ordinarily."

Plaintiff's intestate, in going from his residence to his store, passed over this railroad crossing. On the night he was killed the freight train was on the main track traveling west and after striking him ran 217 feet before stopping west of the crossing. The car was on the pilot or cow-catcher of the engine in an upright position. Plaintiff's intestate was on the south side of the main track about fifty feet from the crossing, and was killed almost instantly. The car plaintiff's intestate was driving was going north on Fourth Street, toward Highway No. 10. It was a level crossing. There is a North Carolina "Stop" sign at the intersection. It was in evidence, for plaintiff, that "A man going that evening on Fourth Street could see eastwardly down those tracks after he got on the first siding. You would have to get pretty close to the tracks before you could see anything. He would have to get by those buildings." Plaintiff's intestate was killed about 6:30 o'clock in the evening, 2 December, 1937. Fourth Street at that time was 29 feet, 11 inches wide. It is the same distance all across these tracks until it enters Highway No. 10 on the north side. There are four tracks crossing Fourth Street. The third track on Fourth Street going north was the main or "death" track.

A. A. Fuller, witness for plaintiff, testified, in part: "Q. To what extent does the location of those boxcars as they were located on the night of December 2, obstruct the view of one crossing Fourth Street to his right? Ans.: Going north, approaching the railroad track, you would have to get upon the railroad track, the spur track, before you can see down east of the train approaching. You cannot see down the track. The depot and those cars obstruct the view. Q. How close would a person in an automobile going north on Fourth Street have to be to the main line track before he could see past these obstructions that you have described, looking east on the main line, to see a train or any other object? (The Court): Q. Have you ever tried it out to see? Ans.: Yes, sir. Q. Been in a car? Ans.: Yes, sir, measured it out for a reason. Q. Go ahead. Ans.: You would have to be 8 or 10 feet before you could get to the main line. Q. Do you mean by that answer that you would have to be within 8 or 10 feet of the south rail of the main line track before you could see past these obstructions to the east? Ans.: Yes, sir. Q. You have tried that yourself? Ans.: Yes, sir. I made an examination of the condition of the crossing at Fourth Street the next day after Mr. White was killed. Examined it right carefully. The rails projected above the crossing two inches. I measured it with a 2 x 4. It is two inches thick. It was lower between the two main tracks, two inches lower. The street itself was paved. It wears out there so bad. Q. Was it worn out? Ans.: Yes, sir. Q. What else did you observe about the condition of the pavement? Ans.: Between the

rails and the shoulders of the filling in there, there is right smart little space in there. It was mighty rough. Going across in an automobile it bumps you so, I mean it is so low between the rails when you cross over you drop down and have to go up again to get over it. Q. How long had that condition existed prior to December 2, 1937? Ans.: It stays rough pretty much of the time, I don't know how long. . . . Q. State how frequently the Fourth Street crossing is used and what sort of traffic there is across that crossing? Ans.: Fourth Street is the main crossing. . . . It would be hard to get at the volume of traffic across the Fourth Street crossing December, 1937, and immediately prior thereto, but it is heavily used because it is the main crossing and residential section on the south and all the business on the north, and the post office on the north, and everybody has to go across there to get their mail from the south side and to get their groceries. The post office is on No. 10 Highway between Fifth and Fourth Streets. It faces the railroad. Highway No. 10 is built up for business purposes between Third and Fifth Streets. . . . I have observed the traffic conditions on Fourth Street both day and night. It was frequently used prior to December 2, 1937, at nighttime by automobiles and other vehicles. There was no street light of any sort immediately over the railroad tracks where you cross Fourth Street. . . . On December 2, 1937, the railroad company did not maintain any sort of lighting signals on that crossing. There was no red or green light maintained at that crossing. There was no gate maintained by the railroad to obstruct passengers when trains were passing. They did not keep any watchman to watch out for passing trains. . . . I am familiar with the number of trains that crossed that crossing at or about December 2, 1937. We have eight passenger trains a day, each going back and forth, and then we have numerous freights. We have a local that goes one way one day and back the next, and then we have numerous freights going through. Some of these trains are operated at night and some in the day. : . . The condition of traffic on that highway at night was practically regular all the time, heavy traffic on No. 10 always. On December 2, 1937, just before night, there came a little shower. It was damp, cold and foggy. It rained a little bit just before night. I can't say exactly the time Mr. White was killed because I was at the house, and did not get there until after it was all over. It was between 6 and 7 o'clock. About 6:30. It was dark."

Witnesses for plaintiff testified that the train was running 40 to 50 miles an hour; and that the train did not blow any whistle or ring any bell.

Mrs. Mabel C. White testified, in part: "I am Mrs. F. L. White, Mr. White was 63 years old at his death. We had been married 36

years. We have four children. We have one girl who is 16. My husband's business was that of a druggist. He was a licensed pharmacist. I couldn't tell you exactly how long he had been licensed, about 31 years. He did not go to the University. I can't think of the name of the college where he received his education. For a year prior to his death, he gave practically all his time to his business. Mr. White had phlebitis caused from a sting he got in Florida in 1925. Whenever he would hurt his leg it would cause a sore on it. That incapacitated him from work very little. For two or three years prior to his death he lost very little time from his work on account of that or any other physical ailment. Other than the phlebitis, his health was perfect. I imagine his eyesight was just about that of the average man of his age. His hearing was good. Q. What were the average earnings of Mr. White over a period of three years prior to the date of his death? Ans.: I would say between $3,000 and $4,000 a year. He owned his own home. It was located in Mebane on Fourth Street. The family and I occupied that as a family home. He owned the drugstore business he operated. He owned the building in which the drugstore is located. He had one boy employed assisting him in the drugstore at the time of his death. My son also worked there all the time. I also worked there. Not very much previous to his death."

Plaintiff offered in evidence section 77 of the Ordinances of the town of Mebane, reading as follows, to wit: "Section 77. Railroad, etc. It shall be unlawful for any person, persons or corporations to run any train or trains within the corporate limits of the town of Mebane, at a greater rate of speed than 15 miles an hour, or to blow or allow to be blown any locomotive whistle within the city limits, except when necessary for proper signals. Any person, persons or corporations violating this ordinance shall pay a fine of $10.00 for each offense."

Plaintiff offered in evidence the Mortuary Table, sec. 1790, of the Consolidated Statutes: Completed age, Expectancy of Life at 64 shows 11.7 years. Completed age at 63 shows 12.3 years.

The court charged, in part: "She (plaintiff) alleges that all of these negligent acts, or that at least some of them, proximately produced and brought about the collision and the death of her husband, her intestate. She says that his estate has suffered and will suffer to the extent of at least one hundred thousand dollars. She alleges that he was in good health at the time of his death, that he owned and operated a drug business, that he had a reasonable expectancy or might expect to live in the future 11 to 13 years, or approximately 13 years if he lived out his normal span of life. (A) She alleges that he was earning from $3,000 to $4,000 a year, or she alleges that after deducting his own personal living expenses and other necessary expenditures that he would

make that, that there would have been net earnings to his estate of from $3,000 to $4,000 a year, and that this multiplied by his expectancy of at least 11 years, would give the sum of $33,000 to $44,000, and that the present cash worth of this sum would amount to a substantial sum, she contends and insists from $35,000 upwards. (A)  [The defendant excepted to that part of the charge set out between the letters (A) and (A).]  . . .  If you answer the second issue 'No,' then go to the third and last issue, which is: What amount, if any, is the plaintiff entitled to recover of the defendant?  The burden of proof of that issue is upon the plaintiff, Mrs. White, to satisfy you by the greater weight of the evidence of any injury proximately resulting from defendant's negligence, and extent of the injury and damages sustained.  (R) With regard to the third issue, the court instructs you that if the plaintiff is entitled to recover at all, she would be entitled to recover such sum as damages for loss of life as would be the present value of the net income of the deceased, and this is to be ascertained by deducting the cost of his living and ordinary expenditures from his gross income and then estimating the present value of the accumulation of such net income based upon the number of years that he would have lived, or his expectancy. (R)  [The defendant excepts to that part of the charge set out between the letters (R) and (R).]  In applying this rule, and in order that the jury may properly estimate the reasonable expectation of life of the deceased, it should consider his age, habits, industry, means, business qualifications, skill, physical condition, and say from the evidence offered what would have been his reasonable expectation of life. Now, gentlemen, under that rule the plaintiff offers in evidence the mortuary tables, and the court admits such tables as evidence in the case tending to show the probable expectation of the life of plaintiff's intestate.  As the court recalls, the statute fixes the expectancy of plaintiff's intestate at approximately 11 or 12 years.  They were read to you and you remember what the counsel said.  If you desire to examine them, if there is no objection by counsel, the court will permit you to do so.  The fact that the Legislature has passed this statute and provided that a person's expectancy may be so much, is not conclusive. The statute itself provides that that is merely evidence for you to consider along with all the other evidence in the case as to the probability of how long the life of a person in question would have been had he lived out his natural and normal period of time.  (T) In this case plaintiff contends that her husband was in good health, that he was operating a business, that he could operate his car, and was earning from three to four thousand dollars a year; that his expectancy was from 11 to 13 years; that he had accumulated around $40,000 to $50,000; that he would have earned more as time passed and when you

deduct his personal and ordinary expenses there would have been left over his period of expectancy of life a sum in the neighborhood of $50,000, or approximately that sum, and she contends that his estate has been damaged to that extent. (T)   [The defendant excepts to that part of the charge set out above between the letters (T) and (T).]"

The issues submitted to the jury, and their answers thereto, were as follows:

"1. Was plaintiff's intestate fatally injured by the negligence of the defendant, as alleged in the complaint?"   Ans.: 'Yes.'

"2. If so, did the plaintiff's intestate, by his own negligence, contribute to his fatal injury, as alleged in the answer?   Ans.: 'No.'

"3. What amount, if any, is the plaintiff entitled to recover of the defendant?   Ans.: '$10,000.' "

The court below rendered judgment on the verdict.   The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court.   The material ones and necessary facts will be set forth in the opinion.

*T. C. Carter and Brooks, McLendon & Holderness for plaintiff.*
*Long, Long & Barrett and W. T. Joyner for defendant.*

CLARKSON, J.   At the close of plaintiff's evidence and at the conclusion of all the evidence, the defendant made motions for judgment as in case of nonsuit.   C. S., 567.   The court overruled these motions and in this we can see no error.   On a motion for nonsuit, the evidence which makes for plaintiff's claim, or tends to support her cause of action, is to be taken in its most favorable light for the plaintiff, and she is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom.

The evidence of plaintiff is to the effect that the defendant's freight train, going west, was traveling between 40 and 50 miles an hour, contrary to a town ordinance, ringing no bell and blowing no whistle, over a street crossing in the business section of the town, on which there was heavy traffic.   There was a drizzling rain and it was a dark, foggy night.   There were no safety appliances, stop lights or warning signals at Fourth Street.   The crossing was rough and worn out, the rails projecting above the crossing two inches.   The depot and boxcars obstructed the view of an approaching train going west of a traveler in a car on Fourth Street going north—he would have to be within eight or ten feet of the south rail of the main track before he could see the train which killed plaintiff's intestate.

We think there was sufficient evidence to be submitted to the jury on the question of negligence and contributory negligence. *Moseley v.*

*R. R.,* 197 N. C., 628; *Lincoln v. R. R.,* 207 N. C., 787; *Preddy v. Britt;* 212 N. C., 719.

In the *Moseley case, supra,* at p. 638, quoting from 60 A. L. R., at p. 1196, it is said: " 'Where the evidence shows that a railroad crossing is for any reason peculiarly dangerous, it is a question for the jury whether the degree of care which a railroad company is required to exercise to avoid accidents at crossings imposes on the company the duty to provide safety devices at that crossing.' " *Harper v. R. R.,* 211 N. C., 398 (405).

Some of the questions of negligence that arise on the facts in this record are set forth in *Sanders v. R. R.,* 201 N. C., 672 (678): "In *Hendrix v. R. R.,* 198 N. C., at p. 144, is the following: 'It is well settled in this jurisdiction that the violation of a town or city ordinance, or State statute, is negligence *per se,* but the violation must be the proximate cause of the injury. Ordinarily, this is a question for the jury if there is any evidence, but, if there is no evidence that the violation of the ordinance or statute is the proximate cause of the injury, this is for the court to determine.' In *Collett v. R. R.,* 198 N. C., at pp. 762, we find: 'An engineer in control of a moving train is charged with the duty of giving some signal of its approach to a public crossing; if he fails to perform this duty the railway company is deemed to be negligent; and if as a proximate result of such negligence, injury is inflicted the company is liable in damages. *Russell v. R. R.,* 118 N. C., 1098; *Perry v. R. R.,* 180 N. C., 290; *Moseley v. R. R.,* 197 N. C., 628.' In *Kimbrough v. Hines,* 180 N. C., at p. 280, the Court quotes from cases as follows: 'It is also established by the weight of authority that it is not always imperative on a traveler to come to a complete stop before entering on a railroad crossing; but "whether he must stop, in addition to looking and listening, depends upon the facts and circumstances of each particular case, and so is usually a question for the jury." . . . Persons approaching a railroad crossing are not required, as a matter of law, to stop before attempting to cross, but his omission to do so is a fact for the consideration of the jury.' " N. C. Code, 1935 (Michie), secs. 2621 (47) and 2621 (48).

In *Harris v. R. R.,* 199 N. C., 798 (799), we find: "The law in this State does not impose upon the driver of a motor vehicle, on his approach to a public crossing, the duty, under all circumstances, to stop his vehicle before driving on the crossing. Whether under all the circumstances, as the evidence tends to show, and as the jury may find from the evidence, the failure of the driver to stop, as well as to look and listen for an approaching train at a railroad crossing, was negligence on his part, is ordinarily a question involving matters of fact as well as

of law, and must be determined by the jury under proper instructions."
*Keller v. R. R.* and *Davis v. R. R.,* 205 N. C., 269 (278).

From a careful reading of the charge on damages, we think it preju-
dicial. The court below charged the jury that "If the plaintiff is
entitled to recover at all, she would be entitled to recover such sum as
damages for loss of life as would be the present value of the net income
of the deceased, and this is to be ascertained by deducting the cost of his
living and ordinary expenditures from his gross income and then esti-
mating the present value of the accumulation of such net income based
upon the number of years that he would have lived, or his expectancy."

The rule laid down in *Carpenter v. Power Co.,* 191 N. C., 130 (132-3),
is as follows: "Under the State law, the damages for the pecuniary
worth of the deceased are to be ascertained by deducting the probable
cost of his own living and usual or ordinary expenses from the probable
gross income derived from his own exertions based upon his life ex-
pectancy. *Purnell v. R. R.,* 190 N. C., 573. And in ascertaining these
damages, the jury is at liberty to take into consideration the age, health
and expectancy of life of the deceased, his earning capacity, his habits,
his ability and skill, the business in which he was employed and the
means he had for making money—the end of it all being to enable the
jury fairly to determine the net income which the deceased might rea-
sonably have been expected to earn, had his death not ensued. In
*Benton v. R. R.,* 122 N. C., 1007, the following instruction was ap-
proved: 'To enable the jury properly to estimate the reasonable expecta-
tion of pecuniary advantage from the continuance of the life of the
deceased, they should consider his age, habits, industry, means, business
qualifications, skill, and his reasonable expectation of life.' It is only
the present worth of the pecuniary injury resulting from the wrongful
death of the deceased that may be awarded the plaintiff. It is not the
equivalent of human life that is to be given, nor is punishment to be
inflicted, or anger to be appeased, or sorrow to be assuaged, but only
a fair and just compensation for the pecuniary injury resulting from
the death of the deceased is to be awarded," citing authorities.

Damages of this kind, unlike damages for pain, suffering and mental
anguish, are susceptible of somewhat accurate proof.

N. C. Code, *supra,* sec. 1790, is as follows: "Mortuary tables as
evidence.—Whenever it is necessary to establish the expectancy of con-
tinued life of any person from any period of such person's life, whether
he be living at the time or not, the table hereto appended shall be
received in all courts and by all persons having power to determine liti-
gation, as evidence, with other evidence as to the health, constitution
and habit of such person, of such expectancy represented by the figures
in the columns headed by the words 'Completed age' and 'Expectation,'
respectively," etc.

This statute would indicate, as far as practicable, a formula to estimate the expectancy of the continued life of a person. The pecuniary worth must be ascertained by "deducting the probable cost of his own living and usual or ordinary expenses from the probable gross income derived from his own exertions based upon his life expectancy."

Upon the present record it seems probable, although this is by no means clear, that the difference between deceased's gross income and his gross income "from his own exertions" was substantial and the vice in the charge was the failure of the court below to make this distinction clear, which we think was prejudicial to defendant. In view of the substantial damages involved in the instant case, this must be held as reversible error.

For the reasons given, there must be a

New trial.