NATHANIEL COLTRAIN, by His Next Friend, J. H. COLTRAIN, v. AT-
LANTIC COAST LINE RAILROAD COMPANY and L. N. STEPHEN-
SON.

(Filed 11 October, 1939.)

**1. Trial § 22b—**

Upon a motion to nonsuit all the evidence sustaining plaintiff's cause
of action, whether offered by plaintiff or elicited from defendant's wit-
nesses, must be considered in the light most favorable to plaintiff, and he
is entitled to every reasonable intendment thereon and every reasonable
inference therefrom, C. S., 567.

**2. Trial § 24—**

If there is more than a scintilla of evidence supporting plaintiff's cause
of action, defendant's motion to nonsuit should be overruled and the cause
submitted to the jury.

**3. Railroads § 9—Evidence held not to disclose contributory negligence as
matter of law on part of plaintiff in entering upon tracks at crossing.**

The evidence favorable to plaintiff tended to show that defendant's rail-
road train approached the public crossing at which the accident occurred
without giving any warning signal, that the train approached through a
cut, and that plaintiff's view was obstructed by the cut and by the tops
of felled trees lying along the right-of-way and partly thereon, that plain-
tiff stopped 15 feet from the track, looked both ways and listened with-
out seeing or hearing a train, that he then put his truck in low gear and
entered upon the crossing at about five miles an hour and was struck by
defendant's train. _Held:_ The evidence does not disclose contributory
negligence as a matter of law, and defendant's motion to nonsuit on that
ground was properly denied.

Appeal by defendants from _Thompson, J.,_ and a jury, at April Term,
1939, of Washington. No error.

This is an action for actionable negligence brought by plaintiff against
defendants alleging damage.

The evidence on the part of plaintiff tended to show that defendant
railroad operated trains over its tracks from Plymouth to Rocky Mount,
N. C. On the day of the alleged injury, 6 March, 1937, between 1:00
and 2:00 o'clock on Saturday afternoon, in the daytime, an engine of
defendant pulling 14 cars struck plaintiff at a highway crossing on a dirt
road and permanently injured him—his back was broken in three places,
a fracture of the tenth thoracic vertebrae and fractures of the first and
third lumbar vertebrae with paralysis of his bladder and rectum. Before
the injury he had been in perfect health and a good worker.

Nathaniel Coltrain, the plaintiff, a young man 17 years of age, lived
near where the injury occurred, with his father. He was driving a one
and a half ton truck, 1934 model Chevrolet, loaded with boards. He

testified, in part: "I was driving carefully about twenty-five to thirty miles per hour along the State Highway. No one was in the truck but me. To get to the Sykes place you have to turn off of the highway on a dirt road. The dirt road is about half a mile from Gardner's Creek bridge. At this point the highway turns sharply to the left leaving the railroad track. Before reaching that point the highway and railroad track are practically parallel for some distance. . . . About thirty days before I was injured some timber had been cut in those woods. The pine tops were laying over to the right towards the railroad. They were lying right close to the track. Q. How close did they extend to the rail of the track, the iron rail? A. They hung over the right of way about four feet or a little further. There were four, five, six or eight of the pine tops. They were large tops. At the time I was injured the pine needles were still on those tops. Q. What effect did that have upon your ability to see a train coming down that track from the direction of Plymouth? A. You couldn't see it at all. The railroad track in going from Plymouth towards Williamston crosses Gardner's Creek. Coming from Plymouth the railroad goes down grade until it gets to Gardner's Creek and then it comes up grade to where this crossing is. It is graded down below the surface of the land. It is graded down about six feet. Q. What effect does that have on the ability or did it have on your ability to see a train coupled with that obstruction you have just described? A. I couldn't see it. The railroad comes up a rather steep hill for this part of the country. When I got to the dirt road I turned off to go to the Sykes place. When I turned off I had to come to a stop to make my turn. That was because of the acuteness of the angle of the road and the road being leveled up that way. I came to a stop to make the turn. There was much traffic on the highway that day. It was Saturday. From the edge of the highway it is about 30 feet down the dirt road to the railroad track, that is, from the edge of the highway to the rail of the track. As I made the stop and started again I put it in low gear. I did not change gears before I got to the railroad track. My truck was moving about five miles per hour. I remember after I got to the railroad track but after the train hit me I don't remember anything else. Just as my truck got to the railroad track the train hit me. It was a freight train. Q. Did that train blow? A. No, sir. Q. Did it ring any bell? A. No, sir. Q. Did it give any warning of any kind? A. No, sir. As I turned off the highway to go down that dirt road I looked and listened both for the train. As I went towards the railroad track I was driving carefully and looking and listening. One of the windows of my truck cab was broken out and the other was cranked down. Both of them were down. Q. Could you have heard that train if it had blown or rung a bell? A. Yes, sir."

On cross-examination, he testified: "The brakes on the truck were in good condition. There was no trouble about my stopping. When I made the turn I stopped there long enough to put it in low gear. Been operating a car all my life. You have to go slower on a truck to change gears than on a car. After I turned I stopped and looked and listened. Q. Where did you stop? A. About half way from the highway to the track. Q. You say you made the turn in low gear, drove half way from the concrete to the railroad and there came to a complete stop? A. Yes, sir, and looked. Q. You came to a complete stop half way between the concrete and the railroad? A. Yes, sir. Q. And there you looked? A. Yes, sir. Q. Which way did you look? A. Towards Plymouth and Williamston both. Q. Then you started up? A. Yes, sir. Q. Did you ever look again? A. Looked about the time the train hit me. I saw that. · Q. And you never looked until just as the train was hitting you? A. There wasn't but a mighty short time to look or do anything. Q. You didn't look again until you looked up and ran right into the train? A. I didn't run into the train. Q. Well, the train ran into you? A. Yes, sir. Q. How far were you from the track when you stopped? A. I was about half way. Q. How far is that? A. I said around thirty feet. That would leave fifteen feet from the track. Q. Did you tell the jury you stopped fifteen feet from the track? A. I said around fifteen. Q. Was it fourteen or fifteen? A. I didn't measure it. Q. Your best estimate is you stopped fifteen feet from the track? A. Yes, sir. Q. Came to a complete stop? A. Yes, sir. Q. How long did you stay stopped there? A. I don't know. I didn't look at my watch. Q. Half a second? A. Long enough to look and listen. Q. How long did you look and how long did you listen? A. I looked both ways. Q. How long did you stop at a complete stop? A. Around half a minute. Q. And then drove on and didn't look again until you saw the train right on top of you? A. I looked both ways and didn't see it and I just pulled right on off and about that time—— Q. You told the jury you were fifteen feet or thereabouts from the track when you came to a complete stop and looked and listened? A. Yes, sir. Q. You started off in low gear going about five miles an hour? A. Yes, sir."

J. H. Coltrain testified, in part: "There were no warning signs of any kind on that dirt road between the highway and the crossing. Prior to the time the boy was hurt there had been eight pine trees cut in there. There was also some small stuff but I don't know what it was. There were eight pines measuring from twenty-two inches to twenty-eight inches on the stump. Some of those tops were laying on the shoulder of the railroad and some up and down the shoulder. The needles were on those tops then. The tops had been there about thirty days from the looks of the straw. It had just started dying. I don't hardly know

but I should think those tops were piled some six or eight feet close to the bank of the ditch beside the crossties of the railroad. Q. What effect did those tops have on the ability of a man driving along that dirt road from the highway towards the railroad track to see a train on the track? A. You practically couldn't see anything until you got right on the track. Leaving Gardner's Creek the railroad goes through a field first and then strikes the woods and goes up a hill through the cut and goes out of the cut just as it gets to this road crossing. I don't know how deep the cut is but in some places it is deeper than others. Some places eight feet and some a foot and a half to two feet at the road. It is different depths. The deepest point is down near the creek. It is deeper where it first starts in the hill and comes out of the hill right at the road crossing about six feet before you get to the road crossing. . . . I was at the scene of the accident last week. The tree tops are not now like they were at the time of the injury. They are burned up."

Wendell Griffin testified, in part: "Part of the tops hung over the right of way and part were still in the woods. Those tops had been there thirty or forty days before the accident. The straw was turning brown. The tops extended about half way from the bank to the cut down ground. Q. What effect did those tops have on a man driving down the highway and turning in the dirt road seeing a train approaching from the direction of Plymouth? A. Cut the complete view off of that dirt road. Court: Cut the complete view of the railroad off? A. Yes, sir, till you got pretty close to the track. When you got to the track you could see down the railroad. You would have to get around eighteen or twenty feet, sixteen or eighteen feet of the rail before you could see. Those tops were dense enough that you could not see a train through them and high enough that you couldn't see over them. In addition to the tops the train came through a cut around four or four and a half feet, I should imagine, coming up grade through a cut. Naturally, the lower the train was the less view a man would have above the ground to see. With the pine tops it would make it harder to detect that a train was coming. I know that the point of woods has been burned over since this accident. The tops were there then and they are gone now."

Clarence Wallace testified, in part: "The train and myself both left Jamesville about the same time, not much difference. I could see the smoke all along in open places. I didn't see the train after it crossed Gardner's Creek. I saw the smoke. Q. Have you an opinion satisfactory to yourself about how fast that train was running? A. It was bound to have been running around fifty miles an hour or better. I was running around forty and he had gained on me from Jamesville and was ahead of me. I did not hear it blow. In some places I would be two

or three hundred yards from the train and other places nearer at the bend of the road. I did not hear the train give any signal."

The testimony above set forth was corroborated by many witnesses. The testimony of defendants contradicted that of plaintiff.

The issues submitted to the jury and their answers thereto were as follows:

"1. Was plaintiff injured by the negligence of defendant, as alleged? A. 'Yes.'

"2. Did plaintiff, by his own negligence, contribute to his injuries? A. 'No.'

"3. What damage, if any, is plaintiff entitled to recover? A. '$8,000.' "

The court below rendered judgment on the verdict. The defendants made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and other necessary facts will be set forth in the opinion.

*W. L. Whitley* for plaintiff.
*Thos. W. Davis, Rodman & Rodman,* and *Z. V. Norman* for defendants.

CLARKSON, J. The Atlantic Coast Line Railroad Company, defendant, states the questions involved as follows: "(1) Is the plaintiff as a matter of law guilty of contributory negligence barring recovery? (2) Is there error in the charge?" We think both questions must be answered against the defendants.

At the close of plaintiff's evidence and at the conclusion of all the evidence, the defendants made motions in the court below for judgment as in case of nonsuit. C. S., 567. The court below overruled these motions and in this we can see no error.

It is the settled rule of practice and the accepted position in this jurisdiction that, on a motion to nonsuit, the evidence which makes for the plaintiff's claim, and which tends to support his cause of action, whether offered by the plaintiff or elicited from the defendant's witnesses, will be taken and considered in its most favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.

In *Moseley v. R. R.,* 197 N. C., 628 (635-6), it is said: "A serious and troublesome question is continually arising as to how far a court will declare certain conduct of a defendant negligent and certain conduct of a plaintiff contributory negligence and take away the question of negligence and contributory negligence from the jury. The right of

trial by jury should be carefully preserved, and if there is any evidence, more than a scintilla, it is a matter for the jury and not the court."

Plaintiff's evidence was to the effect that defendant railroad neither blew a whistle nor rang a bell on approaching the public crossing where the injury to plaintiff occurred.   That the plaintiff Nathaniel Coltrain, before going on the track, stopped fifteen feet from the track, looked both ways and did not see or hear the train.   After stopping he started off in low gear, going about five miles an hour.   The view of the train was obstructed by pine tops partly lying on the right of way of the railroad, which affected the ability of plaintiff to see the train approaching through a cut.   Plaintiff testified: "As I went towards the railroad track I was driving carefully and looking and listening. . . . Q. Could you have heard that train if it had blown or rung a bell? A. Yes, sir."   J. H. Coltrain testified: "You practically couldn't see anything until you got right on the track."

In *Pokora v. Wabash Ry. Co.*, 292 U. S., 98, 54 Sup. Court Reporter, 580 (581), *Mr. Justice Cardozo*, delivering the unanimous opinion of the Court, said: "The burden of proof was on the defendant to make out the defense of contributory negligence.   *Miller v. Union Pac. R. R.*, 290 U. S., 227, 232, 54 S. Ct., 172, 78 L. Ed., 285.   The record does not show in any conclusive way that the train was visible to Pokora while there was still time to stop. . . .   In such circumstances the question, we think, was for the jury whether reasonable caution forbade his going forward in reliance on the sense of hearing, unaided by that of sight.   No doubt it was his duty to look along the track from his seat, if looking would avail to warn him of the danger.   This does not mean, however, that if vision was cut off by obstacles, there was negligence in going on, any more than there would have been in trusting to his ears if vision had been cut off by the darkness of the night.   *Cf. Norfolk & W. Ry. v. Holbrook* (C. C. A.), 27 F. (2d), 326.   Pokora made his crossing in the daytime, but like the traveler by night he used the faculties available to one in his position.   *Johnson v. Seaboard Air Line R. Co.*, 163 N. C., 431, 79 S. E., 690, Ann. Cas., 1915 B, 598; *Parsons v. Syracuse, B. & N. Y. R. Co.*, 205 N. Y., 226, 228, 98 N. E., 331.   A jury, but not the court, might say that with faculties thus limited he should have found some other means of assuring himself of safety before venturing to cross."

The *Johnson case, supra,* quoted by *Justice Cardozo,* was written by *Walker, J.,* of this Court, a unanimous opinion.   *Mr. Justice Walker* was one of the most careful Justices that ever sat on this Court and had an infinite capacity for painstaking.   At pp. 442, 443 and 444, it is said: "As generally pertinent to the case in hand, we may formulate the following rules: (1) Where a railroad track crosses a public highway, both

a traveler and the railroad have equal rights to cross; but the traveler must yield the right of way to the railroad company in the ordinary course of the latter's business. *Duffy v. R. R.*, 144 N. C., 26. (2) While a train has the right of way at a crossing, it is the duty of the engineer to give signals and exercise vigilance in approaching such crossings. *Coleman v. R. R.*, 153 N. C., 322. (3) A railroad company and a traveler on a highway crossing are charged with a mutual duty of keeping a careful lookout for danger; the greater the danger, the greater the care required of both. *R. R. v. Hansbrough's Admx.*, 107 Va., 733. (4) On reaching a railroad crossing, and before attempting to go upon the track, a traveler must use his sense of sight and of hearing to the best of his ability under the existing and surrounding circumstances— he must look and listen in both directions for approaching trains, if not prevented from doing so by the fault of the railroad company, and if he has time to do so; and this should be done before he has taken a position exposing him to peril or has come within the zone of danger, this being required so that his precaution may be effective. *Cooper v. R. R.*, 140 N. C., 209; *Coleman v. R. R.*, 153 N. C., 322; *Wolfe v. R. R.*, 154 N. C., 569, in the last of which cases the rule was applied to an employee charged with the duty of watching a crossing and warning travelers of the approach of trains, and he was required to exercise due care, under the rule of the prudent man, for his own safety by looking and listening for coming trains. (5) The duty of the traveler arising under this rule is not always an absolute one, but may be so qualified by attendant circumstances as to require the issue as to his contributory negligence, by not taking proper measures for his safety, to be submitted to the jury. *Sherrill v. R. R.*, 140 N. C., 255; *Wolfe v. R. R., supra.* (6) If he fails to exercise proper care within the rule stated, it is such negligence as will bar his recovery. *Provided, always,* it is the proximate cause of his injury. *Cooper v. R. R., supra; Strickland v. R. R.*, 150 N. C., 7; *Wolfe v. R. R., supra.* (7) If his view is obstructed or his hearing an approaching train is prevented, and especially if this is done by the fault of the defendant, and the company's servants fail to warn him of its approach, and induced by this failure of duty, which has lulled him into security, he attempts to cross the track and is injured, having used his faculties as best he could, under the circumstances, to ascertain if there is any danger ahead, negligence will not be imputed to him, but to the company, its failure to warn him being regarded as the proximate cause of any injury he received. *Mesic v. R. R.*, 120 N. C., 489; *Osborne v. R. R., supra* (160 N. C., 309). (8) If a traveler is without fault, or if his fault is either excused by some act of the company or is not the proximate cause of his injury, the company having the last clear chance, and if in attempting to cross track on a highway

he is suddenly confronted by a peril, he may without the imputation of negligence adopt such means of extrication as are apparently necessary, and is only held to such measure of care as a man of ordinary prudence would exercise in the same circumstances. *Vallo v. Express Co.,* 14 L. R. A., 745; *Lincoln v. Nichols,* 20 L. R. A., 855; *Crampton v. Ivie Bros.,* 124 N. C., 591, and especially *Douglas v. Railway,* 82 S. C., 71; 3 Elliott on Railroads (2 Ed.), sec. 1173."

The principles set forth in the *Johnson case, supra,* have been consistently followed by this Court. We think the facts in this case are on "all fours" with the case of *Moseley, supra.* Similar cases are: *Lincoln v. R. R.,* 207 N. C., 787; *Preddy v. Britt,* 212 N. C., 719; *White v. R. R., ante,* 79.

The law in all the cases above cited has been so thoroughly gone into recently that we can see no reason for repetition in this cause. We have read the record and learned briefs of the litigants with care; none of the exceptions and assignments of error made by defendants can be sustained.

On the record there is no prejudicial or reversible error.

No error.