990 F.2d 1440
 25 Fed.R.Serv.3d 531, 36 Fed. R. Evid. Serv. 1344
 Larry Edward DIXON; Estate of Sally H. Dixon, by her
personal representative Johnathan Branch Dixon,
Plaintiffs-Appellees,
v.
CSX TRANSPORTATION, INCORPORATED, a Virginia corporation,
Defendant-Appellant,
and
Seaboard System Railroad, a Virginia corporation; Seaboard
Systems Railroad, Inc., a Virginia corporation;
CSX Corporation, a Virginia corporation,
Defendants.
 No. 92-1652.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 28, 1992.
Decided April 13, 1993.
 
 Thomas Ashe Lockhart, Cansler, Lockhart & Evans, P.A., Charlotte, NC, argued (Thomas D. Garlitz, on brief), for defendant-appellant.
 Roger Kent Brown, Brown, Hogin & Montgomery, Charlotte, NC, argued (James R. Glover, Glover & Petersen, P.A., Chapel Hill, NC, on brief), for plaintiff-appellee Larry Dixon (Charles McB. Sasser, Cox, Gage & Sasser, Charlotte, NC, on brief), for plaintiff-appellee Sally Dixon.
 Before RUSSELL, WILKINSON, and LUTTIG, Circuit Judges.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 CSX Transportation, Inc., appeals from alternative judgments rendered in favor of Larry and Sally Dixon totalling $13,609,308 on a Federal Employers' Liability Act (FELA) claim and $15,109,308 on two state law claims. All three claims arose from a 1985 accident in which a train operated by CSX struck Mr. Dixon's automobile. For the reasons that follow, we vacate both judgments, dismiss the FELA claim, and remand for a new trial on the Dixons' state law claims.
 
 I.
 
 2
 Appellee Larry Dixon was a traveling agent employed by the Southern Weighing and Inspection Bureau ("SWIB"), an unincorporated association of railroads including appellant CSX Transportation.[1] On November 8, 1985, Dixon was driving west along North Carolina Highway 27 in Mecklenburg County, North Carolina, en route to Blacksburg, South Carolina, on business. Dixon made a left turn onto Rhyne Road and proceeded south toward the point at which the CSX train tracks cross Rhyne Road, fifty-eight feet from the intersection with Highway 27. At the crossing, a three- to four-foot high bank covered with weeds ran along the northern edge of the CSX railroad bed to the east of Rhyne Road.
 
 
 3
 Ralph Cox, the only independent eyewitness to the accident, was driving north along Rhyne Road toward Dixon and the CSX crossing as Dixon approached from the north. Cox testified that he first heard the whistle of the CSX train as it emerged from behind a treeline approximately 200 feet east of the crossing. At about this time, Cox looked straight ahead and saw Dixon, whom he had previously observed moving slowly toward the CSX crossing, "within a few feet of the railroad tracks." J.A. at 213. According to Cox, Dixon had been looking to his left toward the oncoming train and then had turned forward with a startled expression on his face. Apparently realizing that he did not have time to stop and back up, Dixon tried to clear the crossing in front of the lead engine, but the CSX train struck the left rear quarter panel of Dixon's automobile. The accident left Mr. Dixon a permanently brain damaged quadriplegic.
 
 
 4
 Dixon brought a personal injury suit against CSX, claiming that he was entitled to recovery, alternatively, under FELA if it were determined that he was employed by CSX at the time of the accident, or otherwise under North Carolina law.[2] Dixon's wife sought recovery for loss of consortium under North Carolina law.[3] CSX moved to bifurcate the trial on the FELA and state law claims. The district court denied the motion and allowed the Dixons to pursue both actions in the same proceeding.
 
 
 5
 At the close of the case, the district court first instructed the jury to decide Mr. Dixon's FELA claim. As to this claim, the jury answered a special verdict in Dixon's favor, finding that: (1) Dixon, in addition to being an employee of SWIB, was also employed by CSX at the time of the accident and was therefore covered by FELA; (2) CSX's negligent failures to blow the train whistle in a timely fashion, to clear known obstructions from its right of way, and to install active warning devices at the "extrahazardous" Rhyne Road crossing, were collectively a proximate cause of Dixon's injuries; (3) Dixon was not contributorily negligent; and (4) Dixon was damaged in the amount of $13,609,308--$8,609,308 for his "Financial Needs" and $5,000,000 for his pain and suffering. Notwithstanding the exclusiveness of the FELA remedy, and over CSX's objections, the district court then instructed the jury on the Dixons' state law claims. As to these claims, the jury again found that CSX had been negligent on the three grounds recited above, that Dixon was not contributorily negligent, and that he was damaged in the amount of $13,609,308. The jury awarded Mrs. Dixon $1,500,000 on her loss of consortium claim.
 
 
 6
 The district court thereafter entered judgment on the FELA verdict and ordered that if the judgment were overturned on appeal, the Dixons could nonetheless recover on the state law verdicts that had been rendered in their favor. CSX brought this appeal, challenging the district court's denial of CSX's motions to bifurcate the trial and for judgment notwithstanding the verdict (JNOV), and its admission of testimony from two of Dixon's expert witnesses. We address these challenges in turn.
 
 II.
 
 7
 CSX moved to bifurcate the trial pursuant to Fed.R.Civ.P. 42(b) so that the jury would determine in the first proceeding whether, at the time of the accident, Mr. Dixon was employed by CSX within the meaning of FELA and, depending upon its resolution of this question, would determine in the second proceeding whether CSX was liable to Dixon on either his FELA or state law claims. The district court denied the motion without comment. J.A. at 62-63.
 
 
 8
 CSX argues that the district court abused its discretion in refusing to bifurcate the trial. Although trial courts must be given wide latitude in managing the litigation before them, we agree that under the particular circumstances of this case, it was an abuse of discretion to deny the motion to bifurcate. As a consequence of the simultaneous trial of the FELA claim and the North Carolina causes of action, the jury heard inflammatory evidence on Mrs. Dixon's loss of consortium that, although relevant to the Dixons' state law claims, was irrelevant to the FELA claim, and it heard incitive evidence relevant to the FELA claim that was irrelevant to the Dixons' state law actions. The inevitable effect of the introduction of this highly prejudicial evidence was to deny CSX the fair trial to which it was entitled on both the Dixons' federal and state claims.
 
 
 9
 With respect to the loss of consortium claim, the jury heard emotional testimony from Mrs. Dixon that she had had a "wonderful marriage" with Mr. Dixon; that her husband had always been affectionate and considerate toward her; that the two had had a "wonderful sex relationship"; but that their relationship had been unalterably affected for the worse as a result of the accident. Id. at 785-87, 791-92, 807. This testimony was so powerful that, according to CSX, see Appellant's Br. at 45, several jurors openly wept during its presentation. Additionally, the Dixons introduced birthday and anniversary cards that they had exchanged over the years as evidence of the quality of the relationship that they had enjoyed prior to the accident. J.A. at 805-07, 1138-61.
 
 
 10
 The jury also viewed the videotaped deposition of Dr. Kirkwood Schultz, who testified that the accident had plunged Mrs. Dixon into a severe suicidal depression and forced her to work "when her feet were rotting off and pus was running out of her feet" and otherwise to jeopardize her health in order to keep the family together. Id. at 698-99. All of this evidence, of course, was admissible on the issue of Mrs. Dixon's damages, and perhaps even on the issue of Mr. Dixon's damages, under state law. Because loss of consortium is not actionable under FELA, however, see supra note 3, this highly prejudicial evidence was irrelevant to Mr. Dixon's FELA claim. See Minneapolis, St. P. & S. Ste. M. Ry. v. Moquin, 283 U.S. 520, 521, 51 S.Ct. 501, 502, 75 L.Ed. 1243 (1931) ("In actions under [FELA] no verdict can be permitted to stand which is found to be in any degree the result of appeals to passion and prejudice."); see also Chicago, St. P., M. & O. R. Co. v. Arnold, 160 F.2d 1002, 1008 (8th Cir.1947); Southern Pac. Co. v. Ralston, 67 F.2d 958, 959-60 (10th Cir.1933).
 
 
 11
 With respect to Mr. Dixon's FELA claim, the jury heard extensive testimony on the question of whether Mr. Dixon was employed by CSX. Two former SWIB employees testified that they considered themselves CSX employees and Mrs. Dixon and her son testified that they believed Mr. Dixon worked for the railroad. J.A. at 536-37, 559-60, 579-81, 770-71, 783-84. There was also testimony from the former general manager of SWIB that Mr. Dixon was covered under the Railroad Retirement Act and the Railroad Unemployment Insurance Act, id. at 519-21, 525-26, statutes that differ significantly from FELA in that they expressly cover weighing and inspection bureau employees, see 45 U.S.C. §§ 231(a)(1)(i), (iv); 351(a), (b). Appellees presumably intended for the jury to infer from this testimony that Dixon was, or at least thought he was, a railroad employee for purposes of FELA.
 
 
 12
 This testimony regarding Mr. Dixon's employment served as the foundation for Dixon's closing argument in which counsel characterized CSX as a "ruthless" employer more concerned with "the bottom line" than with the well-being of its employees, J.A. at 964; an employer that "no longer want[ed] to have to contribute to [its] responsibilities to the employees [it] formerly had [i.e., Mr. Dixon]," id. at 941; and an employer that had bullied employees, threatening them with termination if they did not testify in the railroad's favor at Mr. Dixon's trial. Id. at 963-64.[4] While all of this testimony was relevant to an issue that was indisputably central to Dixon's FELA claim, it was wholly irrelevant to the Dixons' state law claims and undoubtedly prejudicial to CSX, especially given the way in which it was drawn together by counsel in closing argument.
 
 
 13
 The joint trial of these distinct actions also resulted in considerable juror confusion, as evidenced by the damages awards on the alternative verdicts. The jury was instructed with respect to Mr. Dixon's FELA claim: (1) that it should reduce any damages awarded for lost wages or injury to earning capacity to reflect anticipated income taxes, see Norfolk & W. Ry. v. Liepelt, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); (2) that it should award damages for loss of enjoyment of life as part of any compensation for pain and suffering, see Dugas v. Kansas City Southern Ry., 473 F.2d 821, 827 (5th Cir.), cert. denied, 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973); and (3) that any awards of future lost wages and medical expenses had to be reduced to present value, see Aldridge v. Baltimore & O.R.R., 866 F.2d 111 (4th Cir.1989) (en banc ). Immediately following return of its verdict on the FELA claim, the jury was instructed with respect to the Dixons' state law claims: (1) that it should not deduct income taxes from any award of damages for lost wages or injury to Mr. Dixon's earning capacity, see Scallon v. Hooper, 58 N.C.App. 551, 293 S.E.2d 843, disc. review denied, 306 N.C. 744, 295 S.E.2d 480 (1982); (2) that it could not award damages for the loss of enjoyment of life, because such recovery is not authorized by North Carolina law; and (3) that it should reduce to present value all future damages, including those for pain and suffering, see Shipp v. United Stage Lines, Inc., 192 N.C. 475, 135 S.E. 339, 341 (1926). Although these significantly different methods for calculating damages would almost inescapably result in different damage awards, the jury awarded Mr. Dixon precisely the same amount ($13,609,308) on his North Carolina and FELA claims.[5] It is evident from the identical verdicts that the jury was unable to distinguish between the FELA and the state law claims, at least insofar as the measures of damages were concerned.
 
 
 14
 The district court undoubtedly believed that the simultaneous trial of these two alternative causes of action would conserve judicial resources and save all parties and witnesses time and expense. Whether or not these laudable goals were served by the single proceeding, "a trial must remain fair to both parties, and such considerations of convenience may not prevail where the inevitable consequence to another party is harmful and serious prejudice." Arnold v. Eastern Air Lines, Inc., 712 F.2d 899, 906 (4th Cir.1983) (en banc ), cert. denied, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). In the circumstances of this case, we are left with the firm conviction that, because the district court tried the federal and state claims together, thereby exposing the jury to the inflammatory and irrelevant evidence on the respective claims recited above, CSX did not receive a fair trial on either the FELA or the state law claims. See generally Cazad v. Chesapeake & O. Ry., 622 F.2d 72, 75 & n. 3 (4th Cir.1980) (noting "marked difference in the basis for liability" under FELA versus state common law and recognizing that "the complexities incident to these divergent theories of liability" may warrant denying FELA defendant leave to implead third parties under a state law claim); Cavanaugh v. Western Md. Ry., 729 F.2d 289, 294-95 (4th Cir.) (instructing district court on remand to try FELA claim and state law counterclaim separately), cert. denied, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 151 (1984). Because we conclude that the denial of CSX's severance motion constituted an abuse of discretion, we vacate the alternative judgments entered by the district court on the jury's verdicts in the Dixons' favor.
 
 III.
 
 15
 CSX urges that a remand is unnecessary because it is entitled to judgment on both Mr. Dixon's FELA claim and the Dixons' state law claims. It contends that the district court erred in failing to grant its motions for JNOV (1) on the FELA claim because Mr. Dixon was not employed by the railroad as a matter of law, and (2) on the state law claims because Mr. Dixon was contributorily negligent as a matter of law, barring both his claim and his wife's derivative action. We agree that CSX was entitled to judgment on the FELA claim. We believe, however, that the question of Mr. Dixon's contributory negligence was properly submitted to the jury.
 
 A.
 
 16
 Mr. Dixon was indisputably employed by SWIB at the time of the accident. He contended at trial that he was also employed by CSX and therefore that he was covered by FELA. Although generally the question of employment status under the Act requires consideration of "factual elements such as to make it one for the jury," in certain circumstances it is properly resolved as a matter of law. Baker v. Texas & Pac. Ry., 359 U.S. 227, 228, 79 S.Ct. 664, 665, 3 L.Ed.2d 756 (1959); see also Chicago, R.I. & Pac. Ry. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735 (1916) (reversing FELA judgment on ground that decedent was not employed by railroad as a matter of law). Due to the peculiar nature of the relationship between SWIB and CSX, and to Dixon's particular assignment at the time of the accident, we believe that this is such an instance.
 
 
 17
 An individual is covered under FELA only if he is injured "while he is employed" by a "common carrier by railroad." 45 U.S.C. § 51. "Employee" status is established by "proof of a master-servant relationship" under principles of common law. Kelley v. Southern Pac. Co., 419 U.S. 318, 323, 95 S.Ct. 472, 475, 42 L.Ed.2d 498 (1974).[6] At common law, "there are basically three methods by which a plaintiff [such as Mr. Dixon] can establish his 'employment' with a rail carrier for FELA purposes even while he is nominally employed by another." Id. at 324, 95 S.Ct. at 476. Mr. Dixon relies on two of these three methods, claiming that he was either a servant acting for multiple masters, one of which was CSX, or a subservant of a company that itself was a servant of appellant. See id.; Appellees' Br. at 11. Under both theories, he must prove that at the time of his injury he was "employed to perform services in the affairs of [the defendant railroad] and ... with respect to the physical conduct in the performance of the services [was] subject to [that railroad's] control or right to control." Kelley, 419 U.S. at 324, 95 S.Ct. at 476 (quoting Restatement (Second) of Agency § 220(1)) (emphases added);[7] see also Linstead v. Chesapeake & O. Ry., 276 U.S. 28, 33-34, 48 S.Ct. 241, 243, 72 L.Ed. 453 (1928) (master-servant relationship for FELA purposes depends on existence of power of railroad to control and direct the performance of services for it by plaintiffs).
 
 
 18
 SWIB, at the time of the accident, was a nonprofit unincorporated association of some sixty-eight member railroads, including CSX.[8] The association's purposes and goals were:
 
 
 19
 to obtain, through inspection and supervision, correct and uniform weighing, classification, marking and packing of freight; the establishment and supervision of weight agreements with shippers and consignees; the policing of transit privileges; [and] the prevention of loss and damage....
 
 
 20
 J.A. at 1126. SWIB was governed by a general committee comprising one officer from each member railroad, which committee "was empowered to review any action of the Southern Weighing and Inspection Bureau at any time [it] chose to." Id. at 517; see also id. at 1127-28, 1137. Each member of the general committee possessed only one vote, regardless of the volume of SWIB services used by his respective railroad. Id. at 515-17, 651, 112728. The general committee elected an executive committee, each of the ten members of which was the chief traffic officer of a member railroad. The executive committee, in turn, appointed an administrative committee from among its members to resolve "administrative and ministerial matters." Id. at 1128-29. Although CSX and Southern Railway were the two largest member-users of SWIB's services and played central roles on both the executive and administrative committees in 1985, control of SWIB rested with the general committee as a whole.
 
 
 21
 SWIB existed and operated independently of each of its member railroads. It had its own rules and employees and operated under a continuing obligation to maintain the business affairs of each of its members confidential from the other member railroads. Id. at 543-45, 547-48. The day-to-day operations of SWIB were managed by the association's general manager, subject to the supervision of the committees. The general manager and his subordinates, who typically assigned traveling agents such as Mr. Dixon to tasks at the request of member railroads, were all SWIB employees. Id. at 546-47, 1129.
 
 
 22
 The wages and expenses of traveling agents were not charged directly to the railroad for which they worked on a given day; instead, all of the hours worked by all of the traveling agents for the various SWIB members in a given month were totalled, and each railroad contributed an amount to an accounting fund based on its proportionate share of the total work performed by the agents during the month. The agents were then paid by SWIB, with monies from this fund. Id. at 523-26, 634-35. CSX paid 56.15% of the wages and expenses of the SWIB traveling agents during the month of Mr. Dixon's injury, because the agents collectively devoted that percentage of their total time that month to the performance of tasks for CSX. Id.
 
 
 23
 At the time of the accident, Mr. Dixon was en route to Blacksburg, South Carolina, at the specific direction of his SWIB division manager. In Blacksburg, he was to install a transit agreement[9] for the shipment and storage of wood pulp belonging to the International Paper Company, which was to be transported by Southern Railway. Id. at 521-22, 539-40, 587-88. As the appellees concede, had Mr. Dixon reached his job site in Blacksburg, he would have been "bound by [Southern Railway's] rules and used that railroad's equipment to perform the job." Appellees' Br. at 3; J.A. at 572-76. Since the transit agreement was to be installed for the benefit of Southern under tariffs filed by that railroad, Mr. Dixon's time for that day was allocated to Southern.[10] Id. at 523-24. CSX had no tracks running to Blacksburg, and no CSX employee would have met Dixon there; in fact, CSX had no knowledge that Dixon had even been dispatched to Blacksburg to install Southern's agreement, because, as noted, SWIB prohibited its employees from discussing one member's affairs with another. Id. at 541, 543-45, 547-48, 590-91.
 
 
 24
 Under these circumstances, we do not believe that jurors, applying the factors set forth in Kelley, could reasonably conclude that Mr. Dixon was employed by CSX at the time of his injury. See Baker, 359 U.S. at 228, 79 S.Ct. at 665. Mr. Dixon clearly was not performing services for CSX. As a SWIB traveling agent, he was on assignment to perform services on behalf of SWIB member Southern Railway. Even if Mr. Dixon were deemed to be performing services for each member railroad whenever he performed services for any one of the railroads or for SWIB as an association, and thus were regarded as having been performing services for CSX at the time of the accident, he certainly was not in any sense subject to CSX's control during the performance of these services. See Bond, 240 U.S. at 456, 36 S.Ct. at 406 (contractor not "employee" of railroad where services were performed for railroad, but railroad "did not retain the right to direct the manner in which the business should be done, as well as the results to be accomplished"); Metzger v. Western Md. Ry., 30 F.2d 50, 51 (4th Cir.1929) (physician employed by railroad to treat its employees not "employee" for FELA purposes because physician "exercises his own judgment free from the company's control or supervision"). He was subject to control only by SWIB and, arguably, Southern Railway. CSX did not even know where Mr. Dixon was at the time of the accident or what work he had been assigned to perform that morning. And because his time on the day of the accident was allocated to Southern, he was effectively paid for his services on that day not by CSX, but by Southern Railway.
 
 
 25
 Appellees argued in their brief that the FELA employment question was properly submitted to the jury, but then asserted at oral argument that, indeed, CSX was Mr. Dixon's employer as a matter of law, because of either its control over SWIB or merely its membership in SWIB. Acceptance of this latter argument would require that we ignore the independent organizational form of SWIB, or at least the relationship of CSX to SWIB, which we refuse to do. There was no identity, in fact or in law, between SWIB and its members. Cf. Seaboard Coast Line R.R. v. Gillis, 294 Ala. 726, 321 So.2d 202, 206 (1975) (identity between a railroad partnership and its two railroad company partners for FELA liability purposes). SWIB was, as noted, an unincorporated association. Its members were not partners or joint venturers, they did not have the powers of partners or joint venturers, and they cannot--and certainly cannot as a matter of law--be saddled with the full panoply of liabilities that such persons assume.[11] Cf. Perpetual Real Estate Servs. v. Michaelson Properties, Inc., 974 F.2d 545 (4th Cir.1992) (affirming need for respect of corporate form). In any event, while it is true that CSX was one of the two members who used SWIB's services most at the time of the accident, it can hardly be said that it "controlled" the association as a matter of law when it possessed only one of sixty-eight votes in SWIB's general committee, the only body that had final decisionmaking authority on behalf of the association. See J.A. at 515-17, 651, 1127-28.
 
 
 26
 We hold, therefore, that as a matter of law Mr. Dixon was not employed by CSX at the time of the accident in question. The district court accordingly erred in submitting to the jury the question of his employment status with CSX.
 
 B.
 
 27
 CSX also moved unsuccessfully for a directed verdict and later for JNOV on the Dixons' state law claims on the ground that Mr. Dixon was contributorily negligent as a matter of law. When determining whether JNOV was properly denied on these claims, we must consider the evidence in the light most favorable to the nonmoving party, here the Dixons, Hunter v. Seaboard Coast Line R.R., 443 F.2d 1319, 1323 (4th Cir.1971), mindful, however, that "more than a 'mere scintilla' of evidence is necessary to defeat the motion." Persinger v. Norfolk & W. Ry., 920 F.2d 1185, 1189 (4th Cir.1990) (citation omitted); cf. Neal v. Booth, 287 N.C. 237, 214 S.E.2d 36, 39 (1975) ("Defendant's motion for a directed verdict on the ground of ... contributory negligence cannot be sustained unless plaintiff's evidence, taken as true and interpreted in the light most favorable to plaintiff, so clearly shows [contributory] negligence ... that it will support no other conclusion as a matter of law."). Applying this standard of review and the controlling North Carolina precedent, we conclude that the district court properly denied CSX's JNOV motion on the Dixons' state law claims.
 
 
 28
 North Carolina law imposes reciprocal duties of reasonable care on motorists and train operators approaching grade crossings. At railroad crossings, motorists "must protect themselves by diligently using their senses for self-preservation." Cecil v. High Point, T. & D.R.R., 269 N.C. 541, 153 S.E.2d 102, 105 (1967). They must look and listen for approaching trains from a position of safety, if there is one, so that their caution is meaningful. See Carter v. Atlantic Coast Line R.R., 256 N.C. 545, 124 S.E.2d 561, 563 (1962); Coltrain v. Atlantic Coast Line R. Co., 216 N.C. 263, 4 S.E.2d 853, 857-58 (1939). Because "[t]he train has the right of way at the crossing," "it is the duty of the driver of the automobile who sees, or should see, the approaching train in time to stop, to do so." Cox v. Gallamore, 267 N.C. 537, 148 S.E.2d 616, 621 (1966). North Carolina law, however, "does not impose upon the driver of a motor vehicle, on his approach to a public crossing, the duty, under all circumstances, to stop his vehicle before driving on the crossing." White v. North Carolina R. Co., 216 N.C. 79, 3 S.E.2d 310, 315 (1939) (quoting Harris v. Black Mountain Ry., 199 N.C. 798, 156 S.E. 102 (1930)).
 
 
 29
 Train operators, too, must exercise reasonable care. "[I]t is the duty of the engineer to give signals and exercise vigilance in approaching [grade] crossings." Coltrain, 4 S.E.2d at 857. Although "[their] failure to do so does not relieve the [motorist] of the duty to exercise due care for his own safety," operators are "under duty to give [motorists] timely warning of the approach of [their] train to a public crossing." Irby v. Southern Ry., 246 N.C. 384, 98 S.E.2d 349, 354 (1957). And under North Carolina common law, railroad companies must maintain automatic warning devices at crossings if the crossings are "so dangerous that prudent persons cannot use them with safety unless extraordinary protective means are used." Price v. Seaboard Air Line R.R., 274 N.C. 32, 161 S.E.2d 590, 600 (1968) (quoting 74 C.J.S. Railroads § 727a.).
 
 
 30
 If the motorist fails in his duty of reasonable care, and his negligence contributes proximately to his injury, his recovery is barred, even if the railroad is also negligent. See, e.g., Irby, 98 S.E.2d at 354; Harrison v. North Carolina R. Co., 194 N.C. 656, 140 S.E. 598, 601 (1927). As CSX notes, the North Carolina courts enforce the motorists' duty strictly, and they have not been chary about holding drivers contributorily negligent as a matter of law. Indeed, "the general rule ... is that a motorist is contributorily negligent in approaching a railroad track if he does not see what he could have seen even if he had to come to a stop to do so." Miller v. Davis, 71 N.C.App. 200, 321 S.E.2d 470, 471 (1984) (emphasis added), disc. review denied, 313 N.C. 331, 327 S.E.2d 892 (1985).
 
 
 31
 CSX contends that the general rule should apply in this case, arguing that the evidence presented at trial unequivocally proved as a matter of law that there was a point of safety somewhere north of the tracks along the Rhyne Road where Mr. Dixon could have stopped and from which he should have seen or heard the oncoming train. We disagree. The North Carolina Supreme Court has repeatedly recognized that "[n]o inflexible rule can be laid down as to what constitutes contributory negligence as a matter of law, as each case must be decided on its own facts." Ramey v. Southern Ry., 262 N.C. 230, 136 S.E.2d 638, 643 (1964). That court, however, has been especially reluctant to take from the jury the question of a motorist's contributory negligence where there is evidence that the motorist's view of the railroad tracks in question was obstructed, that the railroad company had violated its duty of care in failing timely to warn that a train was approaching the crossing, or that the motorist exercised reasonable care under the circumstances but was still struck by the train. In Mansfield v. Anderson, 299 N.C. 662, 264 S.E.2d 51 (1980), for example, where a train collided with a tractor-trailer, the tractor-trailer driver himself testified that he would have had a clear view up and down the tracks when he was within three to four feet of the tracks, and that he could have stopped within one to two feet of the tracks without being struck. Given that the view of the tracks was severely obstructed by vegetation until motorists were within feet of the tracks, however, the supreme court held that the question of the driver's contributory negligence should be left to the jury: "[It was] a question for the jury whether any driver ... can safely stop one foot, or one to two feet, from a railroad track. Rarely should a court decide the legal effect of such minute distances in a negligence action being tried by a jury." 264 S.E.2d at 54 (emphasis added).
 
 
 32
 Similarly, in Johnson v. Southern Ry. (Johnson II ), 257 N.C. 712, 127 S.E.2d 521 (1962), the supreme court for the second time reversed the nonsuit of plaintiff motorist. The motorist, whose view was obstructed by a building and railroad cars on a spur track, had stopped, looked, and listened thirty feet from the tracks and then proceeded to the crossing, where he was struck. Even though the motorist "might have stopped just short of the mainline track and gained a clear view up the track to the north for a distance which would have permitted him to see the on-coming train in time to avoid collision," the court held that the question of contributory negligence should have gone to the jury. 127 S.E.2d at 524. After discussing various sight lines, as well as the distance between the motorist's front bumper and his seat, a measurement that would bear on how close to the tracks the driver would have had to move before risking collision, the court stated that "[m]athematical possibilities and the results of exact measurements, showing minimal space in which observations could be made, should not be controlling factors in determining whether nonsuit should be allowed as a matter of law." Id.[12]
 
 
 33
 Finally, in Neal v. Booth, supra, the North Carolina Supreme Court reversed a directed verdict, holding that a motorist was not contributorily negligent as a matter of law even though he approached a crossing at five miles per hour without ever stopping and the evidence clearly showed that he could have seen the train that killed him when he was still twenty-one feet from the tracks. Because the motorist's view was obstructed until he was twenty-one feet from the tracks, the train gave no warning of its approach, and the automatic signal did not function, the court held that contributory negligence presented a jury question. The court focused on the combination of circumstances at the crossing, stating that "[w]here there are obstructions to the view and the traveler is exposed to sudden peril, without fault on his part, and must make a quick decision, contributory negligence is for the jury." 214 S.E.2d at 40 (quoting Johnson v. Southern Ry. (Johnson I ), 255 N.C. 386, 121 S.E.2d 580, 582 (1961)).[13]
 
 
 34
 The circumstances of the present case are sufficiently analogous to Hunter, Mansfield, Johnson, and Neal that we must reject CSX's argument that it was entitled to JNOV on the Dixons' state law claims. CSX does not dispute that Dixon could not have seen the approaching train from Highway 27; the train would only have become visible at some point along the fifty-eight foot stretch of Rhyne Road between the highway and the crossing, leaving Dixon a short time at best in which to react. Cf. Hunter, 443 F.2d at 1323 (Haynsworth, C.J., concurring) (because there was "such a short space in time and in distance in which [the motorist] could have observed the train approaching," it could not be said that "his failure to effectively avail himself of that fleeting opportunity was negligence as a matter of law"). There was no evidence introduced that Dixon approached the crossing recklessly; in fact, the testimony suggested that he was "almost stopped" as he proceeded slowly southward down Rhyne Road, and that he did look for oncoming trains. J.A. at 252; 213-14. Certainly, viewing the evidence in the light most favorable to Dixon, a jury could reasonably have concluded that Dixon actually stopped, looked, and listened before entering the crossing.[14] See id. at 249-52. There was, moreover, considerable testimony that Dixon's view of the tracks from in and around the crossing was obscured by, among other things, the three- to four-foot embankment covered with one- to two-foot tall weeds that ran along the northern edge of the CSX tracks to the east of the crossing. See id. at 205-06;[15] cf. Mansfield, 264 S.E.2d at 53 (trees, briars, and fence severely obstructed motorists' view of tracks); Neal, 214 S.E.2d at 39 (depot, autos, and boxcars obstructed view). Indeed, CSX's own accident report recited that the obstructed view of the tracks was a cause of the accident. See J.A. at 292-93, 333.
 
 
 35
 The jury also reasonably could have found that Dixon was not given timely warning of the train's approach because the CSX trainmen did not sound their whistle until they were 200 feet from the crossing, despite CSX rules requiring that the whistle be blown at a whistle-post located 1,570 feet east of the crossing. Id. at 211, 218, 253-54, 279-81; see also Neal, 214 S.E.2d at 39 ("A traveler on the highway has the right to expect timely warning" of a train's approach). The Dixons also offered extensive expert testimony from Dr. Kenneth Heathington, from which the jury could reasonably have concluded that the Rhyne Road crossing was extrahazardous and that CSX should have installed automatic warning signals.[16] See, e.g., J.A. at 390; see also Price, 161 S.E.2d at 600. Finally, there was ample evidence from which a reasonable jury could have concluded that there was no point north of the crossing at which Mr. Dixon could have stopped his long-nosed Buick and looked and listened for an approaching train without putting himself in danger of being struck by a train, particularly given that railroad cars overhang the tracks by as much as two feet. See J.A. at 585 ("[T]he front of [Dixon's] car would have to have been almost on the track for him to get a clear view ... of the grade to see the train coming." (emphasis added)); id. at 268 (a driver could not see up the tracks until he stopped the "nose of [his] vehicle within three or four feet" of the tracks); cf. Mansfield, 264 S.E.2d at 53-54 (contributory negligence for jury in same situation).[17]
 
 
 36
 To be sure, CSX offered evidence and testimony, including photographs of the accident scene and sight lines established by a surveyor, that would support a conclusion that Mr. Dixon was contributorily negligent. Contrary to appellant's contentions, however, this evidence and testimony was not such as to allow us to conclude that Dixon was contributorily negligent as a matter of law.[18] The question of contributory negligence ultimately comes down to whether Mr. Dixon should have better used the few feet of space he had in which to make a decision, and "[r]arely should a court decide the legal effect of such minute distances in a negligence action being tried by a jury." Mansfield, 264 S.E.2d at 54. We therefore hold that the district court properly submitted the question of Mr. Dixon's contributory negligence to the jury.
 
 IV.
 
 37
 Finally, CSX argues that the district court erred in admitting certain testimony of two of the Dixons' experts bearing on ultimate issues of liability under both the FELA and state law claims.
 
 A.
 
 38
 Over CSX's objections, the district court allowed Dr. Harry L. Snyder, a "human factors expert," to testify regarding an observational survey of motorists who crossed the CSX tracks on Rhyne Road, which he conducted on two mornings three years after the accident. Snyder informed the jury that 96% of the motorists approaching the crossing from the north, as Mr. Dixon had done, did not stop, and that 64% failed to look to their left--the direction from which Mr. Dixon was struck--before entering the crossing. J.A. at 427-32. During closing arguments, Mr. Dixon's counsel told the jury that, since Dixon had in fact looked to his left before entering the crossing, and since Dr. Snyder's "very scientific study" showed that 64% of drivers do not look left, Dixon had "[driven] better than everybody else out there" and so "was not contributorily negligent." Id. at 976-77.
 
 
 39
 Expert testimony, like all other evidence, must meet the requirement of Fed.R.Evid. 403 that its prejudicial effect not substantially outweigh its relevance. Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir.1986). Dr. Snyder admitted that his testimony and his survey failed to take into account any of the legal duties imposed by North Carolina law on motorists approaching grade crossings. J.A. at 474-76. Even if, as the Dixons claim, the jury was adequately apprised of those duties, we believe that the admission of the survey testimony was error. Dr. Snyder's survey results are wholly irrelevant to the question of whether Mr. Dixon fulfilled his burden to act as a reasonably prudent person, a burden that the North Carolina Supreme Court has defined with specificity, see suprat 1449, when he approached the crossing on November 8, 1985. At most, the survey revealed that a significant number of motorists approaching the crossing do so somewhat carelessly. As CSX rightly points out, however, "[t]he fact that 64% or 96% or even 100% of the motorists do not comply with the duties imposed upon them by law [does] not excuse them or Mr. Dixon from satisfying those obligations." Appellant's Br. at 27-28. At the same time, admission of this testimony was clearly prejudicial to CSX because it strongly suggested that Mr. Dixon was a more careful driver than most and that therefore he could not be considered contributorily negligent.
 
 
 40
 The admission of expert testimony under Fed.R.Evid. 702 is generally left to the sound discretion of the district court. See, e.g., United States v. Portsmouth Paving Corp., 694 F.2d 312, 323 (4th Cir.1982). However, because the jury could not find Mr. Dixon innocent of contributory negligence based on the behavior of drivers in Dr. Snyder's survey, we believe that the admission of the survey testimony was reversible error. See Scott, 789 F.2d at 1055-56; see also Andrews v. Metro North Commuter R.R., 882 F.2d 705, 710 (2d Cir.1989) (admission of plaintiff's expert's testimony constituted reversible error when, inter alia, testimony was not based on applicable standard of care).[19]
 
 B.
 
 41
 Another of the Dixons' experts, Dr. Heathington, testified at length regarding the characteristics of the Rhyne Road crossing from a civil engineering perspective. He opined that the crossing was extrahazardous and that CSX should have installed automatic warning devices. J.A. at 338-90. The jury eventually found that the crossing was extrahazardous and that the railroad was negligent in failing to install active warning devices. CSX challenges the admission of Dr. Heathington's testimony, arguing that it did not "comport with the underlying legal standard governing the issue in question." Appellant's Br. at 28.
 
 
 42
 CSX correctly observes that under North Carolina common law, railroads are required to install active warning devices at grade crossings only if those crossings are "extrahazardous" or "ultrahazardous." "[M]echanical warnings ordinarily are required only at crossings so dangerous that prudent persons cannot use them with safety unless extraordinary protective means are used." Price, 161 S.E.2d at 600. CSX takes issue with Dr. Heathington's testimony, asserting that it does not precisely track the standard enunciated in Price. Dr. Heathington told the jury that
 
 
 43
 [t]here are some crossings because of their design and operation and so forth, that places [sic] a driver at risk, even though you are a reasonable and prudent driver, you have placed your life at risk by using that crossing, because of the deficiencies in that crossing. And that is what would apply to this crossing here, it is an extrahazardous crossing. Any of us in this room would place our lives at extra risk in using that crossing.
 
 
 44
 J.A. at 390 (emphases added). Dr. Heathington's testimony was clearly relevant to the issue of whether the CSX crossing was extrahazardous under North Carolina law, and any difference between the language that he used and that used by the North Carolina Supreme Court in Price is, at most, immaterial. The district court accordingly did not abuse its discretion by admitting this testimony. See Scott, 789 F.2d at 1055; Portsmouth Paving, 694 F.2d at 323.[20]
 
 V.
 
 45
 The alternative judgments against CSX entered by the district court on the jury verdicts are vacated. Because we hold as a matter of law that Mr. Dixon was not employed by CSX at the time of the accident and therefore that he was not covered by FELA, the case is remanded for retrial solely on the Dixons' state law claims, the trial to be conducted in a manner consistent with this opinion.
 
 VACATED AND REMANDED WITH INSTRUCTIONS
 WILKINSON, Circuit Judge, dissenting:
 
 46
 I would affirm the judgment of the district court. I wholeheartedly agree with the majority that Mr. Dixon was not contributorily negligent as a matter of North Carolina law, and that the Dixons' state law claims were properly submitted to the jury. In my view, however, the majority's arguments go further than that. They establish not only that the Dixons' state law claims were properly submitted to the jury, but also that they were properly resolved.
 
 
 47
 To illustrate, I can do no better than to quote from the majority opinion. "CSX does not dispute that Dixon could not have seen the approaching train from Highway 27; the train would only have become visible at some point along the fifty-eight foot stretch of Rhyne Road between the highway and the crossing, leaving Dixon a short time at best in which to react." Majority Op. at 1451. "There was no evidence introduced that Dixon approached the crossing recklessly; in fact, the testimony suggested that he was 'almost stopped' as he proceeded slowly southward from Rhyne Road, and that he did look for oncoming trains." Id. at 1451. "There was, moreover, considerable testimony that Dixon's view of the tracks from in and around the crossing was obscured by, among other things, the three- to four-foot embankment covered with one- to two-foot tall weeds that ran along the northern edge of the CSX tracks to the east of the crossing." Id. at 1451. "Finally, there was ample evidence from which a reasonable jury could have concluded that there was no point north of the crossing at which Mr. Dixon could have stopped his long-nosed Buick and looked and listened for an approaching train without putting himself in danger of being struck by a train, particularly given that railroad cars overhang the tracks by as much as two feet." Id. at 1451.
 
 
 48
 There is ample reason therefore to credit the jury's determination that Dixon was not contributorily negligent. Given this documented support in the majority opinion for the jury's state law verdict, I am at a loss to understand why we should remand this case for another lengthy and exhaustive trial. The justification apparently lies in the prejudicial effect of a pair of trial errors alleged by the majority in its opinion. The prejudicial effect of these errors--if indeed they be errors--is not sufficient to cast any legitimate doubt on the validity of the jury's state law verdict.
 
 I.
 
 49
 The first of the alleged trial errors is the district court's refusal to bifurcate the issue of coverage under the Federal Employers' Liability Act from the issue of substantive liability. The majority appears to offer three rationales for why this refusal to bifurcate might warrant a new trial. Each in my view fails.
 
 
 50
 The first rationale is that the joint trial of the FELA and state claims allowed the jury to hear "highly prejudicial" and "inflammatory" evidence about Mrs. Dixon's loss-of-consortium claim--evidence that was only relevant to the Dixons' state law claim, since FELA does not award damages for loss of consortium. Majority Op. at 1443. This argument cannot support a new trial. Since North Carolina law permits recovery for loss of consortium, any prejudice from the loss-of-consortium evidence as to the Dixons' common law claims would have been, by definition, proper.
 
 
 51
 The second rationale is that the joint trial allowed the jury to hear testimony about whether Mr. Dixon was an employee of CSX, which was "wholly irrelevant to the Dixons' state law claims and undoubtedly prejudicial to CSX." Majority Op. at 1444. This argument is no more persuasive than the first. The testimony about whether Dixon was an employee of CSX was certainly irrelevant to the state law claims, but it was hardly inflammatory or unduly prejudicial. The majority alludes to the closing arguments in which the Dixons' counsel accused CSX of being a ruthless employer which had bullied its employees, and implies that these statements somehow subsumed and tainted the testimony about whether Dixon was an employee of CSX. Majority Op. at 1444. This point stands only if the closing argument by itself was reversible error, a ruling the majority appears unwilling to make. Majority Op. at 1444 n. 4. In the context of such a long and drawn-out trial, I have difficulty believing that some closing remarks, to which CSX did not object at trial, could seriously have affected the jury's verdict.
 
 
 52
 The final rationale is that the joint trial caused "considerable jury confusion," because the jury had to resolve two alternative claims. Majority Op. at 1444. I find nothing to back this bald contention except conjecture. Civil plaintiffs assert alternative theories of recovery all the time. Next to the issues posed in a large antitrust or commercial contract dispute, the issues in this case pale in their complexity and scope: How fast did Mr. Dixon approach the crossing? Did he stop first to look for an oncoming train? How clear was his view down the tracks? Did he have enough time to spot the oncoming train and get out of the way? These are just the sorts of determinations for which juries are best suited. In this case, moreover, the district court took particular care to keep the FELA and state law standards distinct, by bifurcating the charges to the jury, and by allowing the litigants to make separate closing arguments about each claim. Unless we have lost faith in the capacity of juries to resolve civil disputes, the assertion that the joint trial somehow confused the jury must fail.*
 
 II.
 
 53
 The second error that the majority alleges is the admission of testimony by the "human factors expert," Dr. Harry Snyder. At trial, Dr. Snyder testified about how other motorists under his observation had approached the Rhyne Road crossing: 96% did not come to a full stop, and 64% failed to look to their left, the direction from which Mr. Dixon was struck. According to the majority, "Dr. Snyder's survey results are wholly irrelevant to the question of whether Mr. Dixon fulfilled his burden to act as a reasonably prudent person, a burden that the North Carolina Supreme Court has defined with specificity...." Majority Op. at 1452. "The fact that 64% or 96% or even 100% of the motorists do not comply with the duties imposed upon them by law [does] not excuse them or Mr. Dixon from satisfying these obligations." Id. In other words, North Carolina defines the motorist's duty of care in firm rules that have no reference to local custom. Hence evidence like Dr. Snyder's survey is inadmissible.
 
 
 54
 This is a startling proclamation, given the long common law tradition to the contrary. "[E]vidence of the usual and customary conduct of others under similar circumstances is normally relevant and admissible, as an indication of what the community regards as proper, and a composite judgment as to the risks of the situation and the precautions required to meet them." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 33, at 193 (5th ed. 1984) (Lawyer's ed.) (footnote omitted). Before departing from this practice here, I should expect to see some North Carolina authority stating that local custom is never a measure of due care at railroad crossings, or that the common law rules of how a motorist should approach a crossing do not take account of local circumstances. The majority provides no such authority; indeed, it ably demonstrates the opposite. "North Carolina law ... does not impose upon the driver of a motor vehicle, on his approach to a public crossing, the duty, under all circumstances, to stop his vehicle before driving on the crossing." Majority Op. at 1449 (quoting White v. North Carolina R. Co., 216 N.C. 79, 3 S.E.2d 310, 315 (N.C.1939) (internal quotations omitted)). "No inflexible rule can be laid down as to what constitutes contributory negligence as a matter of law, as each case must be decided on its own facts." Majority Op. at 1449 (quoting Ramey v. Southern Ry., 262 N.C. 230, 136 S.E.2d 638, 643 (N.C.1964)).
 
 
 55
 Thus it was within the district court's discretion to conclude that Dr. Snyder's survey was relevant to whether Dixon was contributorily negligent. Moreover, the district court instructed the jurors, when Dr. Snyder testified, that they were to determine the weight of his testimony. The danger that the jury attached undue significance to the evidence of local custom is therefore illusory.
 
 III.
 
 56
 To conclude, the Dixons' state law claims were properly resolved by the jury, and any errors committed by the district court were too slight to have "affect[ed] the substantial rights of the parties." Fed.R.Civ.P. 61 (standard for harmless error). To some, the verdict in this case may seem the product of jury sympathy, but I confess I am not certain how jurors can abandon all feeling for a plaintiff who has been rendered a quadriplegic for life. The question on appeal is not whether the jury was moved by sympathy, but whether it rendered a verdict with a solid foundation in the evidence. I am convinced that it did, for the reasons set forth so well in the majority opinion. My vote to affirm is an expression of regret that the majority has failed to follow its own survey of the case: "Certainly, viewing the evidence in the light most favorable to Dixon, a jury could reasonably have concluded that Dixon actually stopped, looked, and listened before entering the crossing." Majority Op. at 1451.
 
 
 
 [1]
 CSX Transportation, Inc., formerly Seaboard System Railroad, changed its name in 1986
 
 
 [2]
 FELA affords covered plaintiffs the exclusive remedy for personal injury claims. New York C. & H.R.R.R. v. Tonsellito, 244 U.S. 360, 361-62, 37 S.Ct. 620, 620-21, 61 L.Ed. 1194 (1917); Anderson v. Burlington Northern, Inc., 469 F.2d 288, 290 (10th Cir.1972). Dixon, therefore, cannot recover under both FELA and North Carolina law
 
 
 [3]
 Upon Sally Dixon's death shortly after the conclusion of the trial, we granted her estate's motion to substitute its personal representative, Johnathan B. Dixon. Dixon v. CSX Transp., Inc., No. 92-1652 (4th Cir. Oct. 20, 1992). In the interest of clarity, we refer herein to the loss of consortium claim as Mrs. Dixon's. This claim is not actionable under FELA. Kelsaw v. Union Pac. R.R., 686 F.2d 819, 820-21 (9th Cir.1982), cert. denied, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983)
 
 
 [4]
 CSX argues that the closing argument delivered by Dixon's counsel in itself constituted reversible error because it was inflammatory and "out of bounds," see Werner v. Upjohn Co., 628 F.2d 848, 854 (4th Cir.1980), cert. denied, 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981). Because of our disposition of this appeal, we need not reach this contention. We note, however, that had the district court bifurcated the trial and correctly resolved the FELA employment issue, the permissibility of counsel's closing argument presumably would not have been drawn into question. See infra Part III.A
 
 
 [5]
 As part of a general challenge to the size of the compensatory awards to the Dixons, CSX contends that the two verdicts are necessarily inconsistent and that, as a consequence, neither judgment can stand. See Appellant's Br. at 42-43. We do not reach this argument as an independent ground for reversal; we again note, however, that this potential problem would not have arisen had the trial been bifurcated. We also express no view on CSX's separate contention that the awards were excessive
 
 
 [6]
 Appellees misplace reliance on McComb v. Southern Weighing & Inspection Bureau, 170 F.2d 526 (4th Cir.1948), and Walling v. Western Weighing & Inspection Bureau, 160 F.2d 47 (7th Cir.1946), which address the employment status of weighing and inspection bureau employees under the Fair Labor Standards Act (FLSA). "[C]ommon law rules ... throw but little light on who are to be deemed employees" under FLSA because employment status under that statute "is to be determined, not by common law concepts," but by consideration of Congress' intent in the act to give unprecedented breadth and scope to the term "employment." McComb v. Homeworkers' Handicraft Coop., 176 F.2d 633, 636 (4th Cir.) (emphasis added), cert. denied, 338 U.S. 900, 70 S.Ct. 250, 94 L.Ed. 553 (1949); accord Blankenship v. Western Union Tel. Co., 161 F.2d 168, 169 (4th Cir.1947). In contrast, the employment inquiry under FELA "[is] to be determined by reference to common-law principles." Kelley, 419 U.S. at 323, 95 S.Ct. at 476
 
 
 [7]
 The Court in Kelley also observed that § 220(2) of the Restatement "recites various factors that are helpful in applying" the definition of "servant" found in § 220(1). Id. Appellees point out that Mr. Dixon satisfied several of the factors discussed in the Restatement indicating that one is a servant (as opposed to an independent contractor), such as those found in §§ 220(2)(f) (employment for a considerable period of time with regular hours) and 220(2)(g) (monthly salary instead of payment by the job). See Appellees' Br. at 10-11. We fail to see how these facts assist Mr. Dixon in this case, however, since they merely tend to show that he was a general servant of SWIB, not that he was under the control or subject to the control of CSX. See Kelley, 419 U.S. at 327 n. 9, 95 S.Ct. at 478 n. 9
 
 
 [8]
 Appellees rely on a number of cases that discuss employment relationships in partnerships or joint ventures. Most of these, see, e.g., Berger v. Mead, 127 Mich.App. 209, 338 N.W.2d 919 (1983); Conner v. El Paso Natural Gas Co., 123 Ariz. 291, 599 P.2d 247 (Ariz.App.1979), are workers' compensation cases implicating state statutes whose relevance to a FELA inquiry, if any, is tenuous. Even if these cases were applicable, they are distinguishable. Members of unincorporated associations lack the power of control over employees that inheres in partners or joint venturers. Compare Conner, 123 Ariz. at 293, 599 P.2d at 249 ("Where a joint venture exists, each of the parties is the agent of the others and each is likewise a principal of the others so that the act of one is the act of all.") with Feldman v. North British & Mercantile Ins. Co., 137 F.2d 266, 268 (4th Cir.1943) (mere membership in unincorporated association does not subject members to liability for unlawful acts of association); see also Stafford v. Wood, 234 N.C. 622, 68 S.E.2d 268, 270-71 (1951) (discussing common law status of unincorporated associations)
 The other state workers' compensation cases cited by appellees, see Appellees' Br. at 13 nn. 8 & 9, are similarly inapposite because the plaintiffs in those cases concededly were employed by more than one independent business. See, e.g., Hatter v. Lenox, 206 Pa.Super. 263, 212 A.2d 916 (1965).
 
 
 [9]
 Under SWIB's Articles of Organization, SWIB's general manager and SWIB personnel were responsible for the installation and supervision of transit agreements. Id. at 1129. "A transit agreement allows a shipper to have one through rate for his shipment from point of origin to point of ultimate destination rather than a combination of rates to and from a storage facility where the goods might be temporarily stopped or stored." Appellant's Br. at 10 n. 4; see J.A. at 522, 539
 
 
 [10]
 Appellees suggest that the transit agreement was "of at least some potential value to CSX" because the rates set by the agreement and the tariffs filed by Southern would apply to any railroad that hauled the wood pulp. Appellees' Br. at 3, 13. Appellees, however, offered no evidence that CSX would have hauled any of the pulp and, as discussed infra, CSX had no tracks to the city where the pulp was stored. Even if CSX could be said to have received some tangential benefit from Southern's transit agreement and tariffs, the Supreme Court has cautioned against concluding that those who merely perform services for railroads under published tariffs are railroad employees for purposes of FELA. Kelley, 419 U.S. at 326 n. 7, 95 S.Ct. at 477 n. 7
 
 
 [11]
 Nor was SWIB the wholly-owned subsidiary of any railroad. See Pelliccioni v. Schuyler Packing Co., 140 N.J.Super. 190, 356 A.2d 4 (1976) (jury question whether employee of wholly-owned subsidiary was also employee of parent under FELA subservant doctrine when subsidiary's main purpose was to further railroad business of parent)
 
 
 [12]
 In the Johnson case, automatic crossing signals had failed to function. As the supreme court later explained in Mansfield, however,
 in Johnson, the essential error in the nonsuit was the trial court's failure to take properly into account the obstruction to the view of the motorist and in placing too much stress on the evidence that the motorist might have gained a clearer view up the track had he stopped just short of it.
 
 
 [264]
 S.E.2d at 55
 
 
 [13]
 Mansfield, Johnson, and Neal are only several of the most recent railroad crossing accident cases in which the North Carolina Supreme Court, after undertaking the fact-specific inquiry outlined in Ramey, 136 S.E.2d at 643, has left to the jury the question of the motorist's contributory negligence. Other examples include Coltrain, supra; White, supra; Moseley v. Atlantic Coast Line R.R., 197 N.C. 628, 150 S.E. 184 (1929); see also Miller v. Davis, supra (holding that contributory negligence was a jury question under the circumstances)
 In a case applying North Carolina law, this court has also held that the question of a motorist's contributory negligence was for the jury, where the driver's view was obstructed, the driver had little time to react to a fast-moving train, and the train failed to warn on its approach. See Hunter, 443 F.2d at 1320-23.
 
 
 [14]
 CSX appears to concede that if motorists do "stop, look and listen as North Carolina law requires but [are] still unable to avoid an accident," the question of contributory negligence is for the jury. Reply Br. at 8 n. 4
 
 
 [15]
 A local resident warned CSX about this obstruction several times before the accident. Id. at 268-69
 
 
 [16]
 We reject CSX's argument that this testimony was inadmissible. See infra Part IV.B
 
 
 [17]
 The North Carolina Supreme Court has held in several cases that contributory negligence is for the jury even where the motorist failed to stop at an acknowledged point of safety. See, e.g., Mansfield, supra; Neal, supra
 
 
 [18]
 Each of the cases cited by CSX in support of its claim that Dixon was contributorily negligent as a matter of law, see Appellant's Br. at 17-19, is distinguishable on its facts from the instant case. See Ramey, supra (plaintiff approached crossing at excessive speed, failed to stop or look, and had a largely unobstructed view within twenty-two to twenty-five feet of crossing); Carter, supra (plaintiff approached crossing at excessive speed and admitted seeing train while still thirty feet from crossing); Arvin v. McClintock, 253 N.C. 679, 118 S.E.2d 129 (1961) (plaintiff's intestate failed to see train although evidence unquestionably showed he could have seen it when at least twelve to fifteen feet from the crossing and perhaps when ninety feet from the tracks); Dowdy v. Southern Ry., 237 N.C. 519, 75 S.E.2d 639 (1953) (plaintiff had unobstructed view within twenty-five to forty-seven feet of crossing but did not stop or look in the direction from which he was struck until he was already on tracks); Jones v. Atlantic Coast Line R. Co., 235 N.C. 640, 70 S.E.2d 669 (1952) (motorist unquestionably had unobstructed view of approaching train when within twenty-seven to thirty feet of crossing); Parker v. Atlantic Coast Line R. Co., 232 N.C. 472, 61 S.E.2d 370 (1950) (plaintiff had unobstructed view of approaching train when within fifteen feet of crossing); Jeffries v. Powell, 221 N.C. 415, 20 S.E.2d 561 (1942) (plaintiff had unobstructed view when within thirty to forty feet of crossing); Miller v. North Carolina R. Co., 220 N.C. 562, 18 S.E.2d 232, 234 (1942) (plaintiff stopped eight or ten feet in front of first rail of double-tracked crossing when the far tracks were blocked by a freight train; although his view of the nearer tracks was unobstructed, when the freight train was moved, plaintiff, having "failed to see the obvious," proceeded forward and was struck by a passenger train traveling on the nearer tracks)
 
 
 [19]
 The cases cited by appellees in no way support the admission of Dr. Snyder's testimony. In both Vancamp v. Burgner, 99 N.C.App. 102, 392 S.E.2d 453 (1990), aff'd, 328 N.C. 495, 402 S.E.2d 375 (1991), and Easterwood v. CSX Transp., Inc., 933 F.2d 1548 (11th Cir.1991), cert. granted, --- U.S. ----, 112 S.Ct. 3024, 120 L.Ed.2d 896 (1992), the admissibility of certain behavioral evidence was unquestioned, in all likelihood because it was obviously relevant to the legal standards applicable under North Carolina's last clear chance doctrine, see 392 S.E.2d at 454-55, and Georgia's law governing the duty of trains to warn of their approach to crossings, see 933 F.2d at 1558-60, respectively
 
 
 [20]
 We do not reach CSX's alternative contention that the district court should not have admitted Dr. Heathington's testimony because any common law duty owed by the railroad to install automatic warning devices at extrahazardous crossings has been preempted under § 205 of the Federal Railroad Safety Act, 45 U.S.C. § 434. This question has divided the courts, compare Marshall v. Burlington Northern, Inc., 720 F.2d 1149, 1154 (9th Cir.1983) (no preemption) with Hatfield v. Burlington Northern R.R., 958 F.2d 320, 324 (10th Cir.1992) (finding preemption) and Easterwood, supra (no preemption), and the Supreme Court has granted certiorari in Easterwood to resolve this conflict. 112 S.Ct. 3024 (1992). The Court's disposition of Easterwood, of course, may well affect the proceedings in this case on remand
 
 
 *
 The majority points to the identical damages awarded on Mr. Dixon's FELA and state law claims as post hoc evidence of jury confusion. Since the method for calculating damages was different for each claim, the majority reasons that the jury must have been "unable to distinguish between the FELA and the state law claims, at least insofar as the measures of damages were concerned." Majority Op. at 1444-45 (emphasis added). The inferential leap from confusion about damages to confusion about liability is not so obvious to me. As the majority seems to concede by its own qualifying phrase, the most this argument proves is the need to remand for retrial on damages alone. In no way does it justify the more drastic remedy of a whole new trial